## UNITED STATES of America

v.

**Jeffrey I. COHEN, Appellant.**

**No. 81–1036.**

United States Court of Appeals, District of Columbia Circuit.

Argued En Banc Oct. 27, 1982.

Decided May 4, 1984.

---

A. Franklin Burgess, Jr., Washington, D.C., with whom James Klein, Washington, D.C., was on brief, for appellant.

John R. Fisher, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C. (at the time brief was filed), Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on brief, for appellee. John H. Sturc, Asst. U.S. Atty., Washington, D.C., also entered an appearance for appellee.

Before ROBINSON, Chief Circuit Judge, WRIGHT, TAMM, WILKEY, WALD, MIKVA, EDWARDS, GINSBURG, BORK, and SCALIA, Circuit Judges, and Mac-KINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SCALIA, in which Circuit Judges TAMM, WILKEY, GINSBURG, BORK and Senior Circuit Judge MacKINNON join.

Concurring opinion filed by Circuit Judge WILKEY.

Concurring opinion filed by Circuit Judge MIKVA, in which Chief Judge SPOTTS-WOOD W. ROBINSON, III and Circuit Judge J. SKELLY WRIGHT join.

Concurring opinion filed by Senior Circuit Judge MacKINNON.

Separate concurring statement filed by Circuit Judge HARRY T. EDWARDS.

Circuit Judge WALD concurs in the result only.

SCALIA, Circuit Judge:

We hold today that procedures enacted by Congress for automatic commitment to mental institutions of federal criminal defendants successfully asserting the insanity defense do not violate the equal protection component of the due process clause of the Fifth Amendment merely because they are applicable only to persons charged in the District of Columbia.

I

Appellant Jeffrey Cohen was arrested on July 23, 1980, near the embassy of the People's Republic of China. In his possession were three home-made bombs and a loaded 30.06 rifle. As he was being apprehended, Cohen attempted to ignite one of the bombs with a cigarette lighter, apparently in an attempt to kill himself. The next day he was charged with possession of unregistered destructive devices, a federal offense under 26 U.S.C. § 5861(d) (1976). Following a determination of his competency to stand trial, Cohen was tried, initially found guilty as charged, and then, upon consideration of his uncontested insanity defense and testimony by a clinical psychologist as to his mental state at the time of the arrest, found not guilty by reason of insanity.

The court immediately ordered Cohen committed to Saint Elizabeths Hospital, a hospital for the mentally ill in the District of Columbia, pursuant to the provisions of D.C.Code § 24–301 (1981). Shortly thereafter he received a hearing on his then present mental state, as the statute requires, and was recommitted. Cohen ap-

peals both commitment orders, contending that the statute's application of the commitment procedures only to defendants in the District of Columbia and not to other defendants tried for identical federal offenses elsewhere, constitutes an arbitrary classification and thereby deprives him of equal protection of the laws.[1]

The statute at issue here, D.C.Code § 24–301 (1981), is no stranger to this court. Its central provisions—establishing a special verdict of "not guilty by reason of insanity" applicable to all cases in which an insanity defense is raised,[2] and providing that a person acquitted by such verdict be automatically committed to a hospital for the mentally insane[3]—represented a conscious and direct congressional response to our opinion in *Durham v. United States*, 214 F.2d 862 (D.C.Cir.1954), where we abandoned the venerable *M'Naghten* rule and adopted a more lenient test to establish criminal insanity. Congress believed that the *Durham* test would " 'result in a flood of acquittals by reason of insanity and fear[ed] that these defendants would be immediately set loose.' " *Lynch v. Overholser*, 369 U.S. 705, 715, 82 S.Ct. 1063, 1070, 8 L.Ed.2d 211 (1962), *quoting* Krash, *The Durham Rule and Judicial Administration of the Insanity Defense in the District of Columbia*, 70 YALE L.J. 905, 941 (1961).

Once committed, the acquitted defendant is entitled to a judicial hearing within 50 days[4] and at six-month intervals thereafter[5] to determine his present mental state. The former provision was also a response to one of our decisions, *Bolton v. Harris*, 395 F.2d 642 (D.C.Cir.1968). That ruling struck down the statute's automatic commitment provision and permitted the acquitted defendant to be held in a mental institution only long enough to prepare for and conduct a post-trial hearing to establish, by a preponderance of the evidence, that his present mental condition justified his continued incarceration. *Id.* at 651. Congress found that the situation created by our decision posed a danger to society:

> This ruling [*Bolton* ] permits dangerous criminals ... to win acquittals of serious criminal charges on grounds of insanity by raising a mere reasonable doubt as to their sanity and then to escape hospital commitment because the government is unable to prove their insanity following acquittal by a preponderance of the evidence. The result is a revolving door which ... allows defendants "to have it both ways"—to escape both conviction and commitment to a hospital.

---

**1.** He also initially urged, but has since abandoned, the argument that § 24–301 ought to be restrictively read as applying only to persons charged with local (*i.e.,* D.C.Code) offenses. *See infra* at 131–32.

**2.** D.C.Code § 24–301(c) provides:
When any person tried upon an indictment or information for an offense, or tried in the Family Division of the Superior Court of the District of Columbia for an offense, is acquitted solely on the ground that he was insane at the time of its commission, that fact shall be set forth by the jury in their verdict.

**3.** D.C.Code § 24–301(d)(1) provides:
If any person tried upon an indictment or information for an offense raises the defense of insanity and is acquitted solely on the ground that he was insane at the time of its commission, he shall be committed to a hospital for the mentally ill until such time as he is eligible for release pursuant to this subsection or subsection (e) of this section.

**4.** D.C.Code § 24–301(d)(2) provides in relevant part:
(A) A person confined pursuant to paragraph (1) of this subsection shall have a hearing, unless waived, within 50 days of his confinement to determine whether he is entitled to release from custody.

**5.** D.C.Code § 24–301(k) provides in relevant part:
(1) A person in custody ... pursuant to the provisions of this section, claiming the right to be released from custody, ... may move the court having jurisdiction to order his release, to release him from custody....

. . . . .

(5) A court shall not be required to entertain a 2nd or successive motion for relief under this section more often than once every 6 months.

H.R.Rep. No. 907, 91st Cong., 2d Sess. 74 (1970). Accordingly, Congress amended § 24–301 to reestablish the mandatory commitment feature, to shift the burden of establishing an insanity defense at trial to the defendant,[6] and to provide for the 50-day and subsequent six-month hearings—in which (unlike the hearing required by *Bolton*) the acquitted defendant bears the burden of establishing his sanity. If he can prove, "by a preponderance of the evidence," *see* D.C.Code § 24–301(d)(2)(B), (k)(3), that he is no longer mentally ill and dangerous to himself or others, at any of the post-commitment hearings, the statute requires that he be released. *Jones v. United States*, 432 A.2d 364, 372 & n. 16 (D.C.1981) (en banc), *aff'd*, — U.S. —, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983).

Outside of the District of Columbia things are quite different. Several states have enacted automatic criminal commitment procedures similar to D.C.Code § 24–301,[7] but they are applicable only to persons charged with state offenses.[8] There is no comparable federal statutory authority for the commitment of defendants who have successfully presented an insanity defense to a federal criminal charge in United States District Courts in the several states. *See United States v. McCracken*, 488 F.2d 406, 416 (5th Cir.1974). Indeed, only in the District of Columbia is the special verdict prerequisite to such commitment ("not guilty by reason of insanity") statutorily required. Outside the District, acquitted federal defendants are released from federal custody and will remain free from any custody unless committed by the state through its generally applicable civil commitment procedures. Those procedures,

whose nature varies from state to state, are required by the Supreme Court's decision in *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), to employ at a minimum a "clear and convincing" standard for commitment. Thus, the "gap" eliminated by Congress in the District of Columbia persists elsewhere, creating the disparity in treatment among federal defendants which forms the basis of the equal protection challenge in this action.

## II

Before proceeding to the merits of the appeal, a few preliminary issues can usefully be disposed of.

### A. *Interpretation of § 24–301(d)(1)*

In his initial brief appellant asserted that the question of the constitutionality of § 24–301(d)(1) did not have to be reached. He argued that, to avoid constitutional doubt, the statute should not be interpreted "to apply to federal as well as D.C.Code offenses," Appellant's Brief at 27, and should govern "only proceedings involving local criminal offenses," *id.* at 30. The government met this argument by pointing out, among other things, that such an interpretation would avoid one constitutional issue of equal protection only by raising another—namely, "the establishment of one policy for persons found not guilty of District of Columbia Code offenses by reason of insanity and a different policy for those similarly acquitted of United States Code offenses," Appellee's Brief at 35; and that it is an ephemeral equal protection guarantee which can be avoided by simply prosecuting the defendant for the same offense

---

6. D.C.Code § 24–301(j) provides in relevant part:

  No person accused of an offense shall be acquitted on the ground that he was insane at the time of its commission unless his insanity, regardless of who raises the issue, is affirmatively established by a preponderance of the evidence.

7. *See, e.g.,* Colo.Rev.Stat.Ann. § 16–8–105 (1978 Replacement Vol.); Del.Code Ann. tit. 11, § 403 (Supp.1982); Ga.Code Ann. § 17–7–131 (Supp. 1983); Kan.Stat.Ann. § 22–3428 (1981); La.Code

Crim.Proc.Ann. art. 654 (West Supp.1983) (capital offenses only); Me.Rev.Stat.Ann. tit. 15, § 103 (1980); Mo.Ann.Stat. § 552.040 (Vernon Supp. 1983); Nev.Rev.Stat. § 175.521 (1981 Replacement Page); Wisc.Stat.Ann. § 971.17 (West 1971 & Supp.1983).

8. We express no opinion as to the constitutionality of extending such state statutes to defendants acquitted by reason of insanity in federal trials. *See* Appellee's Supplemental Brief for the En Banc Court at 14 n. 8.

set forth in the D.C.Code instead of the U.S.Code, Appellee's Supplemental Brief for the En Banc Court at 45.

Appellant has responded by essentially abandoning the assertion that this case can be disposed of on statutory interpretation grounds. The issue, he now maintains, is "whether Congress could legitimately single out persons in the District of Columbia for [burdens] not imposed upon citizens everywhere else, when Congress has chosen to subject all to substantively identical laws furthering the same national interest.... Whether the statute could be packaged in a local rather than a federal code is not relevant once Congress has declared that nationwide concerns are at stake." Appellant's Reply Brief for the En Banc Court at 2. Obviously, if the equal protection inquiry does not depend upon whether the substantive offense is contained in the D.C.Code or the U.S.Code, we would not avoid the constitutional doubt by unnaturally construing the provision under attack to apply only to the former.

In any event, the legislative history of the provision and decisions of this court indicate its intended application to federal crimes. In 1955, when Congress amended § 24–301 specifically to overrule our decision in *Wear v. United States*, 218 F.2d 24 (D.C.Cir.1954)—which had held that the more lenient provisions relating to pretrial psychiatric examinations contained in 18 U.S.C. § 4244 superseded the conflicting provisions of D.C.Code § 24–301—it clearly contemplated the applicability of § 24–301 to all offenses committed in the District, including U.S.Code offenses. *See* H.R.Rep. No. 892, 84th Cong., 1st Sess. 11 (1955). And we have implemented the provision in accordance with that understanding. *See* *Bolton v. Harris, supra.*[9]

We therefore interpret the statute—as it reads—to apply to all offenses prosecuted in the District of Columbia.

## B. *Standard of Review* [10]

◼ Appellant asserts that the application of equal protection principles to the

9. There is nothing in the text or history of the subsequently enacted District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub.L. No. 91–358, 84 Stat. 473, to support appellant's contention that it was meant to alter the application of § 24–301, and our later decisions do not support that contention. *See* *United States v. Greene*, 489 F.2d 1145, 1171–72 & nn. 65, 66 (D.C.Cir.1973) (Statement of Chief Judge Bazelon as to Why He Would Grant Rehearing En Banc).

10. The concurring opinion of Judge Mikva disagrees with our analysis of the standard of equal protection review, for reasons that we cannot address since they are unexpressed. Mikva op. at 150 n. *. The concurrence spares itself the necessity of conducting this analysis by constructing a dichotomy between action by Congress in its national capacity and action by Congress as a local sovereign. Where the latter is involved, the concurrence asserts, equal protection analysis "will virtually always yield an overriding governmental interest [to support the] congressional decision," Mikva op. at 144, and indeed "[t]he Equal Protection Clause is simply not called out," *id.* at 144. This resembles one branch of our analysis, *see* Part IIIC, *infra,* except for the unprecedented test which Judge Mikva would apply to determine whether Congress is acting as a local sovereign: It is not enough that the law in question applies only locally, in the District of Columbia. In addition to exercising its own authority locally, Congress must permit the states to exercise similar local authority within their own respective jurisdictions.

Although it might have been a good means of buttressing federalism and of assuring the District of Columbia some of the benefits of statehood, the Constitution does not contain the principle that Congress cannot exercise its powers as a local sovereign where it has preempted the states from exercising similar local powers. Nothing prevents Congress from mistrusting and thus overriding the local authority of the states with regard to certain matters, while leaving its own local authority, in which it may have greater confidence, unimpaired. It may, for example, impose a 55-mile-per-hour speed limit on interstate highways nationwide, while leaving itself free to permit higher speeds on the interstate highways in the District that are subject to its own local judgment. Judge Mikva, we take it, would not contest this—but he seeks to impose a similar limitation upon the federal structure through the Bill of Rights, erecting a requirement of greater justification, for equal protection purposes, of laws enacted by Congress for the District which Congress is unwilling to permit the states to enact for themselves. Whether Congress has chosen to permit the states to act locally seems to us to have nothing to do with whether Congress itself may validly do so. If and when equal protection analysis

present case must be subject to the so-called "strict scrutiny" test set forth in such cases as *In re Griffiths*, 413 U.S. 717, 721–22, 93 S.Ct. 2851, 2854–55, 37 L.Ed.2d 910 (1973). That test is applied to legislation that discriminates against a "suspect class," *e.g.*, a minority racial group, *see McLaughlin v. Florida*, 379 U.S. 184, 191–92, 85 S.Ct. 283, 287–88, 13 L.Ed.2d 222 (1964), or that impinges upon a "fundamental" right or interest, *see, e.g., Shapiro v. Thompson*, 394 U.S. 618, 638, 89 S.Ct. 1322, 1333, 22 L.Ed.2d 600 (1969). We find neither here.

In the vast majority of equal protection cases, the focus, for purposes of determining whether a "fundamental interest" is involved, is not upon the punishment or other imposition to which the complaining party has been subjected, but rather upon the *activity* of the complaining party which has been made the *reason* for the punishment or imposition. *See, e.g., Jones v. Helms*, 452 U.S. 412, 425, 101 S.Ct. 2434, 2443, 69 L.Ed.2d 118 (1981). Thus, the rational basis justification normally required to sustain commercial regulation against equal protection attack is not replaced by a "strict scrutiny" test when the consequence of violating the regulation is a deprivation of physical freedom through a jail term, *e.g., Seagram & Sons v. Hostetter*, 384 U.S. 35, 50–51, 58, 86 S.Ct. 1254,

1263–1264, 1268, 16 L.Ed.2d 336 (1966); nor is the strict scrutiny normally applicable to laws abridging the "fundamental right" to travel, *Shapiro v. Thompson, supra*, reduced to a rational basis test merely because the deprivation at issue is a nonfundamental entitlement to government benefits, *cf. Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). If this focus of inquiry were adopted in the present case, the appellant would of course have no arguable claim to a strict scrutiny standard, since the activity at issue (commission of a federal crime while insane) is hardly a fundamental or even a legitimate one.

In the present case, however, the equal protection attack is directed not at the nature or effect of a substantive law (the ban on possession of unregistered firearms and destructive devices) but at the inequity of the punishment or imposition prescribed for the appellant's violation. It could be argued that in such cases the focus of the "fundamental interest" inquiry shifts as well, from the activity affected by the substantive law to the activity curtailed by the penalty. One Supreme Court case arguably supports such an analysis. In *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), which involved an equal protection challenge to the constitutionality of compulsory sterilization for

---

requires a finding of "local interest" underlying congressional action, it is full and complete evidence of such an interest that Congress adopts a special rule locally with beneficial local effects. Nothing is subtracted from that reality by Congress's decision to preempt exercise of similar local authority by the states; and nothing is added to equal protection analysis by making it the crucible for new amalgams of federalism.

Judge Mikva's opinion is a concurrence rather than a dissent only because it has the good sense to misapply the theory it has miscreated. If the equal protection distinction between national action and local action (as Judge Mikva defines them) existed, it would leave this case on the wrong side of the door. The ability of the states to treat other federal defendants as Mr. Cohen has been treated in the District depends upon the rendering, by a federal court, of a verdict of not guilty by reason of insanity. Yet such a verdict on the part of federal courts obviously cannot be compelled by state legisla-

tures, *and has been prescribed by Congress only for federal courts within the District of Columbia.* It is true enough, as Judge Mikva argues, Mikva op. at 147–48, that the mere prescription of a different verdict for District defendants does not give rise in and of itself to equal protection concerns. But it is utterly unrealistic thus to analyze the prescribed verdict in isolation from its intended consequences. It seems to us undeniable that Congress has prescribed for defendants tried for federal crimes within the District a treatment that is different, in fundamental and significant respects, from the treatment which the states have the power to impose upon defendants tried for federal crimes elsewhere: exposure to a verdict of not guilty by reason of insanity, which results in automatic commitment and a shifting of the burden of proof. If the theory of equal protection analysis were as Judge Mikva suggests, it would be unjust to deprive this appellant of his rights by the device of analyzing separately the two parts of a unitary legislative scheme.

some—but not all—third-felony offenders, the Supreme Court found the classification inadequately supported to curtail the "fundamental interest" in human reproduction. Unless, however, the basic right to physical liberty is not to be deemed "fundamental," *Skinner's* apparent indication that the nature of the penalty or imposition may invoke strict scrutiny for purposes of equal protection analysis is simply incompatible with more recent cases such as *United States v. Batchelder,* 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), which applied the rational basis test to an equal protection challenge of a statute effectively assigning two different prison sentences for the same offense. *See also United States v. Shepard,* 515 F.2d 1324 (D.C.Cir.1975). *Skinner* would probably be decided the same way today on "rational basis" analysis under the equal protection clause, *see Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970), or perhaps even on substantive due process grounds, *see Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); *id.* at 169, 93 S.Ct. at 735 (Stewart, J., concurring); *Griswold v. Connecticut,* 381 U.S. 479, 485, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965). It seems unlikely that strict scrutiny of the classification of punishments or impositions on the basis of "fundamental interest" analysis has any place in modern equal protection law.[11]

It is, in any case, clear that the Supreme Court and this court have consistently applied the ordinary rational basis test in their opinions analyzing equal protection problems raised in the civil commitment of criminal defendants acquitted by reason of insanity. The most recent occasion involved the very statute at issue here.

*Jones v. United States, supra,* 103 S.Ct. at 3048 n. 10. *See also Jackson v. Indiana,* 406 U.S. 715, 729, 92 S.Ct. 1845, 1853, 32 L.Ed.2d 435 (1972); *Humphrey v. Cady,* 405 U.S. 504, 508–12, 92 S.Ct. 1048, 1051–53, 31 L.Ed.2d 394 (1972); *Baxstrom v. Herold,* 383 U.S. 107, 111, 86 S.Ct. 760, 762, 15 L.Ed.2d 620 (1966); *United States v. Jackson,* 553 F.2d 109, 120 (D.C.Cir.1976) (considering and explicitly rejecting application of strict scrutiny); *United States v. Ecker,* 543 F.2d 178, 199 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1063, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); *United States v. Brown,* 478 F.2d 606, 610–12 (D.C.Cir.1973) (semble); *Bolton v. Harris, supra,* 395 F.2d at 651. Other federal appellate courts and state supreme courts have done the same. *See Harris v. Ballone,* 681 F.2d 225, 229 (4th Cir.1982); *Powell v. Florida,* 579 F.2d 324, 332–33 (5th Cir.1978); *In re Franklin,* 7 Cal.3d 126, 135, 496 P.2d 465, 470, 101 Cal.Rptr. 553, 558 (1972); *People v. Chavez,* 629 P.2d 1040, 1052 (Colo.1981) (en banc); *Mills v. Delaware,* 256 A.2d 752, 756 (Del.1969); *Chase v. Kearns,* 278 A.2d 132, 138 (Me.1971).

Nor does the statute involve a "suspect class." As described in the Supreme Court's most recent discussion of the subject, the touchstone of such status is that the class is "more likely than others to reflect deep-seated prejudice rather than legislative rationality in pursuit of some legitimate objective." *Plyler v. Doe,* 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982). It is hard to see why the federal legislature would have a particular "deep-seated prejudice" against individuals who are tried within the District of Columbia. The Court has further noted

11. Appellant quotes *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979), for the proposition that "civil commitment for any purpose constitutes a significant deprivation of liberty." He might also quote *Jones v. United States, supra,* 103 S.Ct. at 3048, for the same proposition. He omits, however, the last part of the quoted sentence, which is "that requires due process protection," *id.* These are due process rather than equal protection cases. In procedural due process analysis unlike equal protection analysis, the gravity of

the punishment or imposition *is* critical, both for the purpose of determining whether it constitutes a "deprivation of liberty or property," *see Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972), and for the purpose of determining the procedures such a degree of deprivation may demand, *compare Goss v. Lopez,* 419 U.S. 565, 577–83, 95 S.Ct. 729, 738–40, 42 L.Ed.2d 725 (1975), *with Ingraham v. Wright,* 430 U.S. 651, 682, 97 S.Ct. 1401, 1418, 51 L.Ed.2d 711 (1977).

that "most of the classifications that we have recognized as suspect ... [are] the product of [in]voluntary action," *id.* at 219 n. 19, 102 S.Ct. at 2396 n. 19, often "an immutable characteristic determined solely by the accident of birth," *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973). Commission of an act resulting in criminal prosecution in the District of Columbia is hardly an involuntary or immutable attribute. Finally, the Supreme Court has said that the "suspect class" designation applies to groups that "have historically been 'relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Plyler v. Doe, supra,* 457 U.S. at 217 n. 14, 102 S.Ct. at 2394 n. 14; *quoting from San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). Appellant asserts this to be applicable, on the assumption that the group affected by the statute consists of residents of the District of Columbia, who cannot vote in federal elections. That is not, however, the case, since the legislation applies to all individuals, wherever resident, tried within the District. This group consists principally of those who commit crimes within the District, a class within which some of the (assertedly politically powerless) District residents are likely to be included, but within which many residents of other states, particularly Virginia and Maryland, are likely to be included as well—and within which the most politically powerful members of society are particularly likely to be included. *See, e.g., United States v. Kelly,* 707 F.2d 1460 (D.C.Cir.1983) (former Member of Congress—Abscam investigation); *United States v. Ehrlichman,* 546 F.2d 910 (D.C.Cir.1976) (former Assistant to the President for Domestic Affairs—Watergate scandal); *Fall v. United States,* 49 F.2d 506 (D.C.Cir.1931) (former Secretary of the Interior—Teapot Dome scandal). Moreover, even if one accepts the thesis that the class in question is residents of the District of Columbia, the mere lack of the ballot does not establish political powerless-ness, or, if it does, political powerlessness alone is not enough for "suspect class" status. Minors, for example, are not a suspect class. *Williams v. City of Lewiston,* 642 F.2d 26, 28 (1st Cir.1981). It is, in any event, fanciful to consider as "politically powerless" a city whose residents include a high proportion of the officers of all three branches of the federal government, and their staffs.

The notion that the residents of the District of Columbia constitute a "suspect class" formed an alternate ground for application of strict scrutiny by a panel of this court in *United States v. Thompson,* 452 F.2d 1333, 1340–41 (D.C.Cir.1971). That notion in particular, and the broader proposition that disparate treatment of District of Columbia defendants must be supported by more than mere "rational basis" justification, was implicitly but clearly disapproved by the Supreme Court in *Swain v. Pressley,* 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977). That case involved a challenge to D.C.Code § 23–110(g), which required applications for habeas corpus by prisoners convicted of D.C.Code offenses to be lodged with Article I courts of the District, rather than with the Article III United States District Court. One of the grounds of challenge was an equal protection claim which had been accepted by this court in a companion case that had been consolidated with *Pressley* but that had been vacated and remanded before *Pressley* was decided. *See Palmore v. Superior Court of the District of Columbia,* 515 F.2d 1294 (D.C.Cir.1975) (en banc); 424 U.S. 907, 96 S.Ct. 1101, 47 L.Ed.2d 311 (consolidation with *Pressley* in government's petition for certiorari); 430 U.S. at 376 n. 7, 97 S.Ct. at 1227 n. 7 (description of vacation of judgment and remand). The Supreme Court said:

The Court below in *Palmore* ... also suggested the possibility that § 23–110(g) might be unconstitutional because it denied persons convicted in the Superior Court equal protection of the laws. These persons must assert any collateral attack on their convictions before Art. I

judges, whereas persons convicted under general federal law are allowed to attack their convictions before Art. III judges. But precisely the same classification is made with respect to the original trial and appeal process, which we have already held constitutional. *Palmore v. United States,* 411 U.S. 389 [93 S.Ct. 1670, 36 L.Ed.2d 342 (1973)]. It is certainly reasonable to make the same classification for collateral-review purposes as for purposes of trial and direct review.

A rational basis for the classification is found in the purpose behind the Court Reform Act.

430 U.S. at 379 n. 12, 97 S.Ct. at 1229 n. 12 (citation omitted). Counsel before us in *Palmore* had addressed, and we had considered—with extensive citation to *Thompson*—the argument (similar to that raised by appellant here, at least at the en banc stage), that federal defendants in the District cannot be treated differently from federal defendants elsewhere solely on the basis of the particular code under which prosecution is brought. The Supreme Court's rejection of the equal protection claim on a mere "rational basis" analysis seems to us a considered rejection of *Thompson*'s assertion that provisions uniquely applicable to the District demand a higher degree of scrutiny.[12]

The classification in the present case also does not qualify for what the Supreme Court has called "intermediate scrutiny," *Plyler v. Doe, supra,* 457 U.S. at 218 n. 16, 102 S.Ct. at 2395 n. 16, which requires the classification to be justified by a "substantial" (rather than a "compelling") state interest, *id.* at 224, 102 S.Ct. at 2398. Variants of that review standard have thus far been applied to classification by sex, *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), classification by legitimacy of birth, *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), and classification by lawfulness of presence within the United States for the purpose of determining qualification for state-provided education, *Plyler v. Doe, supra.* What is needed to invoke that standard is unclear,[13] but it surely includes a requirement that the class in question have some of the characteristics of a suspect class, or that the interest in question almost qualify as a fundamental right. *See Trimble v. Gordon,* 430 U.S. 762, 767, 97 S.Ct. 1459, 1463, 52 L.Ed.2d 31 (1977) ("illegitimacy is analogous in many respects to the personal characteristics that have been held to be suspect"); *Plyler v. Doe, supra,* 457 U.S. at 223, 102 S.Ct. at 2398 (the statute under challenge "imposes a lifetime hardship on a discrete class of children not accountable for their disabling status"). On that basis, the present legislation does not qualify, since we find it totally devoid of those characteristics invoking strict scrutiny.

### III

◼ We turn, then, to the merits of the matter, applying the requirement that in order for the statute to survive an equal protection challenge, the different treatment accorded federal defendants acquitted by reason of insanity within the District of Columbia and those acquitted on such grounds elsewhere, must have a "rational basis." The test is no more severe than the realities of government permit, as the following oft-quoted description makes clear:

> The problem of legislative classification is a perennial one, admitting of no doctri-

---

**12.** We do not have the facts of *Thompson* before us, and so do not speak to the holding of that case, which was based upon alternate grounds. We do disapprove, however, the rationale expressed in that decision, and which the concurring opinion in this case would seek to preserve in some diluted form, *see* Mikva op. at 145–46, that distinctive legislative treatment of the District is "particularly suspect" and thus requires more than a rational basis to support it. *Thompson, supra,* 452 F.2d at 1341. We reject that concept whether applied to legislation that is assertedly "local" or assertedly "national" under Judge Mikva's analysis, *see* note 10, *supra.*

**13.** The Supreme Court has said that intermediate scrutiny will be applied only "when concerns sufficiently absolute and enduring can be clearly ascertainable from the Constitution and our cases," *Plyler v. Doe, supra,* 457 U.S. at 218 n. 16, 102 S.Ct. at 2395 n. 16.

naire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.... Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting the others.... The prohibition of the Equal Protection Clause goes no further than the invidious discrimination.

*Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955) (citations omitted). *Accord, Califano v. Jobst*, 434 U.S. 47, 57, 98 S.Ct. 95, 101, 54 L.Ed.2d 228 (1977).

We proceed to discuss in detail the elements that make the legislative distinction here under attack an eminently reasonable one.

## A. *Federalism*

The assertion that Congress acted irrationally when, in enacting mandatory commitment procedures applicable to the District, it "failed to act nationally to achieve the same purpose," Appellant's Brief for the En Banc Court at 17, totally ignores the substantial concern of federalism. It would be enough, for purposes of "rational basis" analysis, merely that that factor *could have* underlain the congressional reluctance to legislate more broadly. *See United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (where

"there are plausible reasons for Congress' action," it is "'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision,'" *quoting Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)); *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it"). In the present case, however, we need not rely upon a mere assessment of plausible reasons. Congress has on a number of occasions considered providing for the commitment, nationwide, of federal defendants acquitted on grounds of insanity.[14] The most recent occasion brought forth a well considered analysis by the House Judiciary Committee of the major concern leading to rejection:

The Committee recognizes that the Federal government is one of specifically enumerated powers. State governments, on the other hand, may act in any given area unless specifically prohibited by the Constitution. Commitment and treatment of the mentally ill has traditionally been left to the states pursuant to their *parens patriae* or general police power. The Federal government has no such authority. Foote, *A Comment on Pre-Trial Commitment of Criminal Defendants*, 108 U.Pa.L.Rev. 832 (1960).... [The report then considers in detail whether Congress has the constitutional authority to provide for a nationwide federal commitment procedure, but draws no firm conclusion.][15]

**14.** *See, e.g.,* H.R.15046, 91st Cong., 1st Sess. (1969); H.R.3907, 94th Cong., 1st Sess. § 3613 at 264 (1975); S.979, 91st Cong., 1st Sess. (1969); S.1437, 95th Cong., 2d Sess. § 3613 at 254 (1978).

**15.** The issue, of course, is whether such congressional action would run afoul of the Tenth Amendment, because legislative authority in the general field of lunacy is reserved to the states. That issue was raised, but not resolved by the Supreme Court's decision, in *Greenwood v. United States*, 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), which involved federal treatment of a defendant found not competent to stand trial on federal charges. The narrow basis on which

the Court found such treatment permissible—*i.e.,* not barred by the Tenth Amendment—was that until the federal charges had been disposed of, the individual was properly in the custody of the United States. *Id.* at 375, 76 S.Ct. at 415. If that is the only permissible basis for federal action in this field, then once the criminal custody is terminated, which may occur at the moment the defendant is acquitted, *see* Note, *Federal Commitment of Defendants Found Not Guilty by Reason of Insanity—Proposed Legislation,* 52 Iowa L.Rev. 930 (1967), the constitutional underpinnings of federal treatment may also dissolve.

Neither the government nor (of course) the appellant urges this view, and we decline to

In view of these considerations, the Committee believes that a Federal procedure for the commitment of the dangerously mental [*sic*] disturbed would constitute an inappropriate interference with the balance of Federal and State powers. Moreover, such a procedure could constitute a precedent for further Federal involvement in the care of the mentally ill. Once the Federal Government takes on the task of caring for the dangerously mental [*sic*] ill that become involved in the Federal criminal system, Congress would most likely be asked to expand the Federal role even further. For example, legislation might be proposed allowing the Federal Government to take over State mental health institutions, or to accept the transfer of those incarcerated there, when the State is allegedly not doing a satisfactory job. The Committee thus believes that the care of the mentally ill is a task that uniquely belongs within the *parens patriae* powers of the States.

H.R.REP. No. 1396, 96th Cong., 2d Sess. 559, 561 (1980). If we were reviewing this aspect of the legislation as though it were merely the rule of a federal agency, we could hardly ask for a clearer and more persuasive statement of basis and purpose.

### B. *Special Concern for the District of Columbia*

Even if a nationally uniform law on the present subject were not regarded as treading upon the prerogatives of the states, there would still be special reason for Congress to enact such a law in the District of Columbia and not elsewhere. Its responsibility for the general welfare of the citizenry in that location is especially grave because it is not shared. *See Neild v. District of Columbia*, 110 F.2d 246, 250–51 (D.C.Cir.1940). And even if the responsibility were nationally uniform, there would be

special reason to exercise that responsibility with regard to confinement of the insane prone to criminal acts within the Nation's Capitol. Recent events demonstrate, if any demonstration is needed, that the attraction of the mentally disturbed to politically prominent figures is a strong one. *See United States v. Hinckley*, 525 F.Supp. 1342 (D.D.C.1981). The same concern for the welfare of its officials that induces the United States to assign protective personnel to particular persons and to particular buildings within the District also reasonably reflects itself in special steps to control the criminally insane in this location.

### C. *Separate Grant of Legislative Authority*

The commitment procedures challenged in this case have been imposed under that constitutional grant which authorizes the federal government "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District ... as may ... become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17. Appellant's position amounts to the assertion that when the federal government has done as much as it can to achieve a particular goal through the exercise of this branch of its powers, it must yet further justify, under the Equal Protection Clause, its failure to pursue the same end under its other powers. We know of no authority for such a proposition and believe that the law is quite to the contrary.

Achieving a particular legislative goal through the exercise of a single legislative authority is almost the paradigm of the "one step at a time" approach approved by *Williamson v. Lee Optical Co., supra*, 348 U.S. at 489, 75 S.Ct. at 465, and has been the basis for the evolution of much of our law. For example, modern antidiscrimination sanctions were first imposed upon

---

reach the issue here, since we find more than adequate basis for Congress's special treatment of District of Columbia acquittals even if Congress has the power to legislate nationwide. If it does not have that power, of course, appellant's equal protection claim becomes utterly frivolous: Defendants acquitted in federal

courts in the several states, no longer being subject to federal jurisdiction, would not constitute a proper reference class for equal protection purposes. *See United States v. Antelope*, 430 U.S. 641, 649 n. 12, 97 S.Ct. 1395, 1400 n. 12, 51 L.Ed.2d 701 (1977).

employers within reach of the federal government's war power, *see, e.g.,* Exec. Order No. 8802 (June 25, 1941), 3 C.F.R., 1938–43 Comp. at 957 (requiring all federal contracting agencies to include an anti-discrimination covenant in defense contracts); were then extended to employers within reach of the contracting power, *see* Exec. Order No. 10,479 (Aug. 13, 1953), 3 C.F.R., 1949–53 Comp. at 961 (extending coverage to non-defense contracts); then to those within reach of the spending clause, *see* Exec. Order No. 11,114 (June 22, 1963), 3 C.F.R., 1959–63 Comp. at 774 (extending coverage to all federally assisted construction contracts); *see generally Contractors Association v. Secretary of Labor,* 442 F.2d 159, 168–71 (3d Cir.1971); then to those within reach of the commerce clause, *see* Title VII of the Civil Rights Act of 1964, 78 Stat. 253, 42 U.S.C. § 2000e *et seq.* (1970) (prior to 1972 amendment) covering employers, employment agencies and labor organizations engaged in an industry affecting commerce that employs 25 or more employees); and finally, to those (state and local governments as employers) within reach of the Fourteenth Amendment, *see* Equal Employment Opportunity Act of 1972, 86 Stat. 103, 42 U.S.C. § 2000e *et seq.* (1976 & Supp. V 1981); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). At none of those stages was it, to our knowledge, contended—and it was certainly never held—that the failure to impose similar restrictions, for purposes of achieving the same policy, upon other employers within the reach of other federal powers constituted a denial of equal protection of the laws. Such a proposition would eliminate one of the major devices for achieving gradual reform, for the pattern described with respect to the civil rights laws has been followed in other fields as well—for example, minimum wage legislation. *Compare* Act of June 19, 1912, ch. 174, 37 Stat. 137, *repealed by* Act of Aug. 13, 1962, 76 Stat. 360, 40 U.S.C. § 324 (1976) (establishing a minimum wage for employees working on federal buildings), *with* the Fair Labor Standards Act of 1938, § 6, 52 Stat. 1062 (current version at 29 U.S.C. § 206 (1976 & Supp. V 1981)) (establishing a national minimum wage for all employees in interstate commerce). *See also* Dodd, *From Maximum Wages to Minimum Wages: Six Centuries of Regulation of Employment Contracts,* 43 COLUM.L.REV. 643, 666–79 (1943).

In other words, in a sense the Constitution itself establishes the rationality of the present classification, by providing a separate federal power which reaches only the present group. As the Supreme Court has said in rejecting equal protection challenges to legislation affecting a group which (unlike District residents) might otherwise qualify as a "suspect class": "[T]he Constitution itself provides support for legislation directed specifically at the Indian tribes.... [T]he Constitution therefore 'singles Indians out as a proper subject for separate legislation.'" *United States v. Antelope, supra,* 430 U.S. at 649 n. 11, 97 S.Ct. at 1400 n. 11, *quoting from Morton v. Mancari,* 417 U.S. 535, 552, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). So also here. Just as one need not inquire whether a soldier is so distinctively situated that it is rational to impose upon him prohibitions not extended, under other constitutional powers, to the citizenry at large; or whether the interstate enterprise is for the relevant purposes different from the local employer who may be reached under other constitutional grants; or whether consumer protection provisions imposed upon merchants within the District of Columbia must rationally be imposed, under the commerce clause, upon merchants elsewhere; so also in the present case, there is no doubt that the treatment of individuals acquitted on grounds of insanity in criminal trials within the District of Columbia need not be extended to defendants similarly acquitted in federal trials elsewhere.

*Judgment affirmed.*

WILKEY, Circuit Judge, concurring:

I concur in Judge Scalia's scholarly analysis for the court. I write only to call attention to a different and simpler analy-

sis of the situation confronting Congress which supports the result reached.

Congress was presented here with a situation where no matter which choice it made, there would be a possible claim of denial of equal protection, and each alternative claim would appear to be of equal stature. If Congress had chosen to make the insanity procedure uniform throughout the federal courts in all 51 jurisdictions, as the appellant contends should have been done here, then Congress would have given all defendants in the federal courts equal protection, but it would have created a difference in the protection accorded law violators in the District of Columbia, depending on whether they fell into the hands of the District or the United States court system. On the other hand, if Congress acted as it did, making a rule for the federal courts in the District of Columbia which is consistent with that of the local court system of the District of Columbia, so that law violators in the District of Columbia are treated identically no matter into which court system they may fall, then Congress arguably created a denial of equal protection between defendants in the federal courts in the District of Columbia and defendants in the federal courts of the 50 states.

Congress chose to do the latter, and I think its choice should be upheld.

First, Congress previously faced exactly the same dilemma, and made the same choice, when considering the Assimilative Crimes Act,[1] which has been upheld as constitutional.[2] By passing the Assimilative Crimes Act Congress decreed that defendants in a federal court brought there by reason of crimes committed on a federal enclave would be treated the same as defendants accused of the same crime brought into the courts of the state in which the enclave is located. There are many state crimes which are not ordinarily federal offenses, but which are made federal offenses if committed on federal reservations. The Assimilative Crimes Act incorporates the state procedure, bail, penalties, and felony/misdemeanor classifications of, for example, New Mexico, into federal trials for crimes committed on federal reservations in New Mexico. Similarly, the penalties, etc., for crimes on a Government reservation in Alaska are made the same as for those crimes committed elsewhere in Alaska and brought before an Alaska state court. This has the result of affording *intrastate* equal treatment to offenders in New Mexico or in Alaska, but creates an *interstate* difference between offenders brought into the federal courts in New Mexico and Alaska, since the Assimilative Crimes Act incorporates divergent state statutes.

The choice Congress made thus assured equality of treatment among all of the offenders in New Mexico and among all of the offenders in Alaska, although there will be a difference between the laws applicable in the two states when offenders are brought before a United States district court in each state. Congress could have said that for all federal reservations throughout the land there would be a uniform common law crime system governing criminal activities on Government reservations, and thus insured uniform and equal treatment for all defendants in all federal courts in 51 jurisdictions, but Congress did not choose to do this. Its choice has been upheld and it is analytically indistinguishable from the choice with which we are confronted in the District of Columbia—federal court uniformity or territorial uniformity, Congress having chosen the latter.

Second, the fact that Congress made this choice and that it should be upheld is reinforced by the recognized extraordinary and plenary power which Congress is given over the District of Columbia. This enables Congress to do many things in the District of Columbia which it has no au-

---

1. 18 U.S.C. § 13 (1976).

2. *United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958); *Franklin v. United States*, 216 U.S. 559, 30 S.Ct. 434, 54 L.Ed. 615 (1910).

thority to do in the 50 states.[3] There has never been any rule of law that Congress must treat people in the District of Columbia exactly the same as people are treated in the various states. For example, it has never been argued that the criminal provisions of the District of Columbia Code should govern the federal enclaves now regulated by the Assimilative Crimes Act.

A third reason for supporting Congress' choice is that it is only in the District of Columbia that Congress has the responsibility over the treatment of insane people. In other jurisdictions the problem of insanity is entirely a state concern. The unique responsibility of Congress for the problem of insanity in the District of Columbia means that Congress should have a variety of options to deal with the problem. There is no reason why a court should say that the choice of any one of them denies equal protection to defendants in the District of Columbia just because the choice is different from that made in the 50 states. Actually, almost anything that Congress chose to do here would be somewhat different from the process employed in many of the states. Variation among the 51 jurisdictions would be inevitable.

In the treatment of the insanity problem, as in dealing with many other problems, there may be differences throughout our vast land, but the differences found here do not rise to the level of a violation of the equal protection guarantee of the Constitution.

MIKVA, Circuit Judge, concurring in the judgment, with whom SPOTTSWOOD W. ROBINSON, III, Chief Judge, and J. SKELLY WRIGHT, Circuit Judge, join:

Easy cases, no less than hard ones, can produce bad law. I am concerned that today's majority opinion, perhaps in reaction to what I now acknowledge was an overly hasty analysis by the panel that initially decided this case, will have precisely such an effect. All of us now agree that

Cohen's commitment was carried out in accordance with the strictures of the equal protection clause. But in the rush to reach this conclusion, the majority transforms Congress' "plenary power" over the District of Columbia into a talisman that gives Congress carte blanche to treat District inhabitants as appropriate specimens for all sorts of experimental national legislation. I recognize that, under many circumstances, Congress *can* single out the District of Columbia for distinct treatment, but Congress is *not*, as the majority apparently would have it, empowered under *all* circumstances to impose more severe burdens on the rights of District of Columbia inhabitants merely because they inhabit the District. Such a tautological reading of the Fifth Amendment's equal protection component is compelled neither by existing precedent nor common sense: Congress can legislate uniquely with respect to District inhabitants when it exercises its powers as local sovereign, *see* U.S. Const. art. I, § 8, cl. 17, but Congress ought not to be able to single out inhabitants of the District for distinct *national* treatment without some sufficient justifying basis. Incantation of the words "plenary power" does not *ex proprio vigore* provide that basis. To attempt to provide an elaboration of the circumstances under which I think Congress can legitimately single out the District for distinct treatment, I write separately.

I.

Jurisdictionally-based equal protection challenges to legislation uniquely applicable to the District of Columbia may pose difficult analytic problems in light of the dual crowns that Congress wears here. The essential framework for analysis, however, is relatively straightforward. When Congress acts in its capacity as local sovereign, as I believe it has in this case, the fact that individuals outside the District of Columbia receive different treatment from

---

**3.** *See Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954); *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 73 S.Ct. 1007, 97

L.Ed. 1480 (1953); *Fireman's Insurance Co. of Washington, D.C. v. Washington*, 483 F.2d 1323 (D.C.Cir.1973).

their state legislatures ought to be constitutionally irrelevant. Individuals within and without the District of Columbia are not similarly situated with respect to congressional legislation enacted in Congress' role as local sovereign. When Congress acts as a national legislative body, however, it has no greater constitutional power to exempt the District of Columbia from truly federal legislation, or to impose a unique federal standard on the District, than it does similarly to single out any particular state for distinct treatment under a federal statutory scheme; only if the differential treatment is sufficiently traceable to disparate conditions in the isolated jurisdiction should that treatment be constitutionally permissible.

This framework will of course not be easy to apply in all cases, for congressional action respecting the District of Columbia cannot always neatly be categorized as "local" or "national". Nonetheless, such a framework ought to provide the starting point for analysis of cases such as this one: when a state legislature could, consistent with federal law, impose the same rule in its state that Congress has imposed in the District, Congress' action ought to be immune from equal protection attack. If such a course is instead closed to the states, either because an affirmative federal rule governs an area or because federal law preempts any state action in that area, a uniform federal rule ought presumptively to apply nationwide. That presumption, in my view, should invoke the equal protection component of the Fifth Amendment. With this skeletal framework set forth, I turn to the facts of this case.

## II.

The statutory scheme being challenged in this case consists of two *independent* elements. The first is the decision to criminalize certain conduct as a matter of federal law. That decision is codified in the provision under which Cohen was charged. *See* 26 U.S.C. § 5861(d) (1982) (possession of unregistered destructive devices). The second is the decision to leave to the states the question of how to deal with individuals who have been absolved, by reason of insanity, of criminal liability for that conduct. This decision is reflected in Congress' failure to enact a federal commitment statute, in the express reasons given for that refusal, which include the desire to leave commitment to the states, Maj. Op. at 137–38, and in the presumption that state law generally remains in place in areas in which Congress has not expressed a clear and manifest purpose to preempt it. *See, e.g., Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978).

It is within this hybrid scheme that 24 D.C.Code § 301 must be assayed. In enacting Section 301, Congress was implementing in the District of Columbia the second element in this hybrid statutory scheme; faced with the "gap" in federal law under which federal insanity acquittees are not automatically confined to mental institutions, Congress, *in its capacity as local sovereign for the District,* chose to require that District insanity acquittees be automatically committed. Any state legislature could have done likewise with respect to federal defendants acquitted by reason of insanity in that state. (It is true that Congress, in enacting Section 301, took one step not available to a state legislature: Congress mandated that Article III courts in the District employ the special verdict of not guilty by reason of insanity. This fact does not have any constitutional relevance. *See infra* pp. 147–48). As a result, if Congress' initial choice to create such a bifurcated statutory scheme—in which certain activity is made a federal crime but in which treatment for those incapable of being held criminally responsible for that activity is left to the states— is constitutionally permissible, Section 301 must per force survive equal protection attack, for Congress *is* the "local" legislative body that must implement such a choice in the District of Columbia.

Distilled to its essence, Cohen's dispute is thus not with Section 301 itself but rather with the constitutionality of the policy deci-

sion to leave to the states the treatment of federal criminal defendants who have been acquitted by reason of insanity. The gravamen of his claim is that, once Congress acknowledges the presence of a federal interest in some area by legislating in that domain, the rights and responsibilities which devolve from that legislation must be similarly federalized. Having decided to define certain activity as criminal, Congress and Congress alone, according to Cohen, is empowered to prescribe the substantive and procedural nature of, *inter alia,* the punishments and defenses entailed in the application of such a statute.

That is simply not the law. Congress often determines that federal interests warrant defining certain activity as a federal crime, but then leaves to the states the task of filing the interstices of that cause of action. As Judge Wilkey points out in concurrence, that is the theory underlying the Assimilative Crimes Act, 18 U.S.C. § 13 (1982), in which crimes on federal enclaves are defined by reference to state law. *See United States v. Sharpnack,* 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958) (upholding the Act against delegation challenge). It is also the approach taken in the recent Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961–1968 (1982), which defines "racketeering activity" as acts or threats involving particular state law crimes. *Id.* § 1961(1)(A) (1982). This longstanding technique of predicating federal offenses on state law was endorsed by the Supreme Court as early as *Clark Distilling Co. v. Western Maryland Ry. Co.,* 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917) (upholding Act criminalizing shipment of intoxicating liquor into a state to be used in violation of that state's law).

Such a "piggy-back" practice is also pervasive in a myriad of civil contexts. Congress frequently has drawn upon state law to help define federal rights, and the Supreme Court implicitly has endorsed that approach many times. The Federal Wrongful Death Act creates a federal cause of action for wrongful death occurring on federal property, but leaves to state law the substantive elements of that cause of action. 16 U.S.C. § 457 (1982). A similar parasitic relationship of federal to state law is codified in the Death on the High Seas Act, 46 U.S.C. § 762 (1976), and in the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1982), *see Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Federal law often builds upon legal relationships established by state law, especially in areas, like family relations or the treatment of the mentally ill, where the states have traditionally exercised primary control. *See generally* P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 470–71 (2d ed. 1973). As these examples attest, congressional enactment of threshold legislation in an area of important individual interests does not violate equal protection principles merely because state law has been left to fill in the details of such a statutory scheme.

The short answer to Cohen's challenge, then, is that a strong federal interest exists in a cooperative federalism that leaves a variety of "federal" issues to be handled by the states. *Cf. Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 290, 101 S.Ct. 2352, 2367, 69 L.Ed.2d 1 (1981) ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the states a regulatory role."). Indeed, this interest is so strong that I can think of no case in which such a scheme would violate equal protection principles. As an extreme example, Congress might define the intentional and premeditated killing of a federal officer to be a federal crime, but then mandate that state homicide statutes govern the punishment of that crime. If Congress, in its capacity as local sovereign, enacted the death penalty in the District of Columbia for local murders, the fact that the federal crime of murdering a federal officer could then be punished by death in the District but only by life imprisonment in a state like Wisconsin, would not, in my mind, transgress the equal protection component of the Fifth Amendment. That would be so even were

the court prepared to characterize the statutes as impinging upon fundamental rights; the structure of American government will virtually always yield an overriding governmental interest for a congressional decision to leave states with control over issues within an area that is otherwise fraught with federal concerns. *See United States v. Sharpnack, supra.* When Congress leaves an area to be governed by the states, that, for equal protection purposes, should be the end of the matter.

A straighter path leads to the same conclusion. The equal protection clause directs that "all persons similarly circumstanced shall be treated alike." *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920). But "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). When Congress exercises its powers as local sovereign for the District of Columbia, the fact that other state legislatures may treat the same problem in a different way is constitutionally irrelevant for equal protection purposes; just as residents of Virginia and Maryland are not similarly situated with respect to their state legislatures, so too residents of the District of Columbia cannot be compared to non-District residents when Congress acts in its capacity *as local sovereign* for the District of Columbia. *See generally Johnson v. United States*, 225 U.S. 405, 417, 32 S.Ct. 748, 752, 56 L.Ed. 1142 (1912) ("There is certainly nothing anomalous in punishing the crime of murder differently in different jurisdictions. It is but the application of legislation to conditions."). The equal protection clause is simply not called out by these circumstances.

There is no reason to alter that conclusion when, as in this case, Congress has acted as a local legislative body as the second step in a statutory scheme where Congress as the first step has worn its national hat in proscribing certain conduct for the entire country. District and non-District insanity acquittees are not similarly situated *for commitment purposes,* even when it is federal statutory law that defines their conduct as criminal and federal common law that provides their insanity defense, as long as Congress has chosen to leave to the states the procedural and substantive rules by which such acquittees are subsequently committed to mental institutions. Should a state desire to extend its mandatory commitment statute to those found not guilty of federal crimes by reason of insanity, I see no constitutional barrier to its doing so. The majority has chosen to avoid this issue. *See* Maj.Op. at 131 n. 8. I see no way to do so, however, for if the states are precluded by force of federal law from enacting automatic commitment statutes that reach federal insanity acquittees, Congress *would* in my mind confront substantial equal protection problems in enacting such a statute for only the District of Columbia. Since states have the power to commit automatically federal insanity acquittees, the fact that Congress enacted an automatic commitment statute for the District of Columbia is therefore no cause for equal-protection concern.

Had the majority rested at this point, I would not be writing. The majority opinion is so broadly drafted, however, that Congress is ceded virtually unfettered authority to single out District of Columbia inhabitants for disparate treatment under federal statutory schemes. Yet if it is correct that Congress violates no equal protection norm when it legislates for the District in an area where Congress as a general matter has left lawmaking power to the states, the obverse of that proposition, which the majority ignores, seems to me equally correct: serious equal protection problems *may* be raised when Congress chooses to enact a uniform, national rule of law and then exempts from the reach of that law the District of Columbia. When enacting national legislation, Congress has no greater power to shackle the District of Columbia with singular treatment than it does similarly to single out any one of the fifty states. In this regard, Congress' "plenary power" over the District of Columbia is of

no constitutional moment; the District, like any state, may be singled out for distinct treatment, but only if jurisdictionally unique factual conditions warrant that distinction.

To return to the death-penalty hypothetical discussed above, suppose Congress now defines murder of a federal officer to be a federal crime and proscribes a penalty of 30–100 years imprisonment for that offense. If Congress were to engraft onto that statute a provision that provided the death penalty for the offense only for the District of Columbia, I would certainly have to pause before concluding that such selective treatment of the District were constitutional. In this hypothetical, unlike the present case, Congress has chosen to act nationally; in doing so, it has totally ousted the states from the area of punishment with respect to this particular federal offense. Having made that choice, Congress would have an extremely heavy burden in establishing that conditions in the District were sufficiently unique to warrant imposition of the death penalty only in that isolated jurisdiction. As a result, District and non-District inhabitants are presumptively similarly situated with respect to both the substantive rule of law and the punishment that attends violation of that law; unless the legislative classification is founded on actual factual conditions which are both peculiar to the District and sufficient to pass the appropriate equal protection standard, the disparate treatment of District inhabitants could not be sustained. In short, the fact that certain United States citizens live within the ten miles squared described so uniquely in the Constitution does not deprive them of the equal protection that their neighbors in Maryland and Virginia enjoy.

That, it seems to me, was precisely what Congress had attempted to do in *United States v. Thompson*, 452 F.2d 1333 (D.C. Cir.1971). There Congress had enacted a national Bail Reform Act applicable to all those convicted of federal offenses. In light of this fact, we refused to interpret the provisions of the local bail act to apply to federal offenses, for to do so would have led to a holding that the local bail act unconstitutionally discriminated against District offenders in an area of fundamental civil liberties: "The passage of such a law [as the National Bail Act] implies a threshold decision to override regional differences in favor of a uniform standard that will govern the entire country. If one small group is then excluded from the operational effect of the statute, the rationality of that exclusion is highly suspect." *Id.* at 1339.

There are two independent aspects to the result in *Thompson;* these aspects must be separated if today's decision and *Thompson* are to be reconciled. The first aspect of *Thompson* is the principle that Congress cannot single out any particular jurisdiction, including the District of Columbia, for distinct treatment under a national scheme without some rational basis. *Id.* at 1338. Certainly national legislation imposing a unique rule on the District of Columbia must at the least be rationally related to the purposes of the legislation, and the fact that the legislation applies only within the District's jurisdictional boundaries does not *a fortiori* provide such a rationale.

The second aspect of the result in *Thompson* is that jurisdictional distinctions regarding the District of Columbia are uniquely suspect, and hence "must be subjected to the strictest possible review," *id.* at 1341, in light of the fact that District residents have no vote in congressional elections. If these statements are taken to mean that District residents are a "suspect class" within the terminology of modern equal protection doctrine, and hence that national legislation uniquely applicable to the District can be justified only by a compelling governmental interest, I accept the majority's position that the statements sweep too broadly. Nonetheless, it is arguable that courts ought to look more closely at legislation that seeks to isolate the District of Columbia from the sweep of national legislation than they look at legislation that singles out a particular state. If District residents do not fully constitute a "suspect class," they nonetheless remain

less than fully enfranchised. Lacking actual or virtual legislative representation in the Congress, inhabitants of the District of Columbia are thus likely to be prime targets of "experimental" national legislation. That does not suggest that, when Congress acts in its capacity as *local sovereign* for the District, the resulting legislation ought to be subject to probing equal protection review; as argued above, such legislation ought to be completely immune from jurisdictionally-based equal protection attacks. It does suggest, however, that when Congress acts in its capacity as the *national* legislature, a separate and unequal legislative scheme for the District of Columbia ought to elicit some concern that invidious lines have been drawn precisely because of the national disenfranchisement of the groups affected by those lines. The majority today rejects the view that such a scheme must always be subject to strict scrutiny, but at least in my view, it remains true that equal protection doctrine ought to be applied to such a scheme with sensitivity to the unique and anomalous position of the District in our system of government. The principle of majority rule loses its moral force when not all the votes are counted. If the residents of the District do not need the parochial protection of elected representatives to the Congress to participate in the logrolling that protects one state from being overrun by the others, it is hard to understand why the framers fought so hard to assure that even the smallest state was allotted two senators and at least one voting representative.

*Swain v. Pressley,* 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977), does not stand for a contrary proposition. In that case, Congress had acted in its capacity as local, rather than national, sovereign; as a result, state legislatures were left equally free to define local crimes, to require that such crimes be tried before state courts (which, of course, are not Article III courts), and to mandate that collateral relief from criminal convictions be pursued first in the state's non-Article III courts. Hence, no need to be suspicious of Congress' singling out of the District of Colum-

bia existed for the simple reason that Congress had *not* singled out the District—it had treated it precisely as any state legislature might have treated its constituents. *See Palmore v. United States,* 411 U.S. 389, 390–91, 93 S.Ct. 1670, 1672–73, 36 L.Ed.2d 342 (1973) ("In this respect, the position of the District of Columbia defendant is similar to that of the citizen of any of the 50 states when charged with a violation of state criminal law: Neither has a federal constitutional right to be tried before judges with tenure and salary guarantees.").

That emphatically was not, however, the situation in *Thompson, supra,* in which Congress had created a single national rule to govern outside the District and had then arguably subjected the District to a distinct and harsher rule. *Swain* plainly does not address such a situation. When, as in *Swain,* Congress acts in its purely local capacity, courts simply do not possess the tools or the standards to police the congressional action via anything other than the constitutional strictures ordinarily applicable to state legislative action, even if the disenfranchisement of District residents makes it just as likely that Congress has acted without due regard to the interests of those residents in passing local, as well as national, legislation. If there is "bite" to the "ten miles squared" provision it is in this respect, not in depriving residents of the District of their protection as United States citizens. District residents may not be entitled to all the protections of a "Republican form of Government," U.S. Const. art. IV, § 4, but they remain United States citizens.

In many circumstances, of course, a federal statute's differential treatment of the District of Columbia or a particular state *will* be constitutionally permissible. Even in those areas in which the Constitution expressly requires uniformity, such as direct taxation, art. I, sec. 8, cl. 1, bankruptcy, *id.* at cl. 3, and naturalization, *id.,* the Court has been reticent to circumscribe narrowly the power of Congress. *See, e.g., United States v. Ptasynski,* 462 U.S. 74,

103 S.Ct. 2239, 76 L.Ed.2d 427 (1983); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 159, 95 S.Ct. 335, 366, 42 L.Ed.2d 320 (1974). Where uniformity is not constitutionally required, Congress has even greater latitude to tailor legislation to distinct conditions; as the Supreme Court explained in *Secretary of Agriculture v. Central Roig Refining Co.*, 338 U.S. 604, 616, 70 S.Ct. 403, 409, 94 L.Ed. 381 (1950), "Congress may devise ... a national policy with due regard for the varying and fluctuating interests of different regions." Congress is no less empowered to take account of such jurisdictional distinctions as they affect the District of Columbia. *Cf. District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973) (holding, on basis of historical factors, that section 1983 of Title 42 of the United States Code, prior to its amendment in 1979, did not apply to the District). But national legislation drafted along jurisdictional lines must rest upon grounds of real difference between the locality unequally burdened and the rest of the nation. Thus, while the majority opinion is probably correct in suggesting that Congress is empowered to impose a 55-mile-per-hour speed limit on interstate highways outside the District while permitting higher speeds in the District, maj. op. at n. 10, such a distinction is not justified merely because Congress has plenary power over the District. Congress, I believe, would equally be within its powers in permitting higher speeds in Utah or Wyoming. Singling out of any of these jurisdictions would be permissible for the same reason: such legislation would almost certainly satisfy the minimal demands that the rationality standard of review would impose in this area. That the legislation would survive equal protection scrutiny does not, however, detract from the requirement that it be subjected to this scrutiny. To reiterate, in this regard the District of Columbia stands on no less equal a footing than any state.

My analysis of this case is not altered by the fact that federal courts in the District are required to employ a special verdict in the form of not guilty *by reason of insanity* when the defendant's sanity is at issue. *See* 24 D.C.Code § 301(c) (1981) (requiring the use of such special verdicts in both federal and local courts). While it is true that Congress has not mandated use of a similar special verdict for federal courts outside the District, it is also true that federal courts here are not the same sort of Article III federal courts that can be found in one of the fifty states. Imposition of the unique special verdict provision in the District traces to this unique and hermaphroditic status of the District's federal courts. As the majority points out, the automatic commitment statute constitutes a direct congressional response to *Durham v. United States*, 214 F.2d 862 (D.C.Cir.1954). At the time of *Durham*, however, the United States District Court for the District of Columbia, unlike other federal district courts, had concurrent jurisdiction over many local criminal matters. *See Palmore v. United States*, 411 U.S. 389, 392 n. 2, 93 S.Ct. 1670, 1673 n. 2, 36 L.Ed.2d 342 (1973). Monte Durham himself was charged with the local offense of housebreaking, 22 D.C. Code §§ 1801, 2201, 2202 (1951); his case thus would not have been in federal court at all were it not for the unique status of the District's federal courts. In ordering "federal" courts in the District to use the special verdict, Congress was therefore responding as a local legislature might to a *Durham*-like decision by its state courts. Thus, the statutorily mandated special verdict is not truly a federal rule within the framework set out above and hence raises no equal protection concerns. Because the *Durham* decision itself cut across the state/federal lawmaking line, Congress was empowered to offer an analogously hybrid response.

Moreover, because the federal courts in the District of Columbia have the unique obligation to provide for commitment of mentally incapacitated federal defendants, it is not unreasonable for Congress to have prescribed the unique special verdict only in the District. Even if the special verdict provision were considered a "federal" rule, there is no right which is infringed by use

of that verdict only in the District. Federal defendants tried in federal courts outside the District have no right not to be automatically committed following an insanity acquittal, nor do they have a right that a jury render only a general verdict of guilty or not guilty against them. As to the former, I have already stated my view that states could extend their automatic commitment statutes to federal insanity acquittees. *See supra* at 142. If, for example, a defendant stipulated to commission of all the underlying acts that constituted a federal crime and offered in defense only the plea of insanity, *see, e.g., United States v. Harper,* 460 F.2d 705, 706, 707 n. 2 (5th Cir.1972), a general verdict of not guilty could be used by a state to automatically commit the defendant to a local mental institution for at least 50 days. *Cf. Jones v. United States,* — U.S. —, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (legislature may presume that one who is found to have been insane at the time he engaged in criminal conduct continues to be mentally ill for at least 50 days after that finding). Support for this view is found in the House Judiciary Committee's recent rejection of a federal commitment scheme, cited by the majority at p. 15, a rejection predicated on Congress' decision to leave to the states the commitment of federal insanity acquittees, and from the legislative history of 24 D.C.Code § 301, *see* H.R.REP. No. 907, 91st Congress, 2d Sess. 74 (1970), which makes clear that Congress did not believe that adoption of automatic commitment procedures unduly burdened the federal "right" to raise an insanity defense. Given this congressional position, states would similarly not unduly burden this federal "right" by enacting automatic commitment provisions.

As to the latter point—that federal defendants have no right to a general verdict when their sanity is at issue—federal courts outside the District of Columbia have employed special verdicts even in the absence of any statutory command to do so. *See, e.g., United States v. McCracken,* 488 F.2d 406, 418–21 (5th Cir.1974). As the court in *McCracken* reasoned, such a ver-

dict may make it easier for a jury to understand that there are several roads to acquittal, and the use of this special verdict does not raise the specter of directing the jury's deliberations in the way that other special verdicts are thought to. That states cannot direct federal courts to employ such verdicts thus does not result from the fact that such verdicts burden a right which Congress has bestowed upon federal defendants, but rather from the principle, grounded in the supremacy clause, that states cannot prescribe the procedures to be used in federal courts. The situation presented in this case is thus very different from one in which Congress had barred the states from automatically committing federal insanity acquittees or had ordered federal courts outside the District to use only general verdicts in criminal cases. Congress in enacting the special-verdict provision for the District has acted to facilitate its decision that local interests require automatic commitment of federal insanity acquittees, but in doing so Congress has not infringed any substantive federal rights of District insanity acquittees. As a result, equal protection principles have not been transgressed.

The government seeks to avoid the general framework of analysis set out in this concurrence by arguing that Congress' power over the District of Columbia cannot be neatly segregated into "local" and "national" compartments; Congress' power over the District, it is said, "encompasses the *full* authority of government...." *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 76, 102 S.Ct. 2858, 2874, 73 L.Ed.2d 598 (1982) (emphasis original); *see also Kendall v. United States,* 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838) ("There is in this district, no division of powers between the general and state governments. Congress has the entire control over the district for every purpose of government...."). That argument, however, misses the mark. As a matter of constitutional power, Congress of course has the full authority of both a local and a national sovereign in the District;

Congress, for example, can invoke its commerce clause power to regulate District corporations that engage in interstate commerce but Congress can also regulate those corporations directly under its local police powers. *See Key v. Doyle,* 434 U.S. 59, 68 n. 13, 98 S.Ct. 280, 285 n. 13, 54 L.Ed.2d 238 (1977) ("[T]he nature of the D.C.Code ... distinguishes it from other federal statutes. Unlike most congressional enactments, the Code is a comprehensive set of laws equivalent to those enacted by state and local governments *having plenary power* to legislate for the general welfare of their citizens.") (emphasis added). Where I take issue with the majority and the government is not over the existence *vel non* of such power but rather with the view that no equal protection barriers confine the way in which that power is subsequently exercised vis-à-vis the way in which Congress exercises its power nationwide. The fact that Congress concededly possesses the threshold power of a dual sovereign in the District does not *a fortiori* mean that Congress can enact one rule for the nation as a whole and a separate rule for only the District. Such a distinction may be permissible, but only after the disparate jurisdictional treatment is subjected to the appropriate equal protection standard. That, rather than the lack of any sharp division between Congress' roles in the District, is the teaching of the Supreme Court's precedents in this area: "Under that [plenary power] clause, Congress possesses not only every appropriate national power, but, in addition, all the powers of legislation which may be exercised by a state in dealing with its affairs, *so long as other provisions of the Constitution are not infringed.*" *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 434–35, 52 S.Ct. 607, 609–10, 76 L.Ed. 1204 (1932) (emphasis added).

The government may be right that difficult borderline cases will arise in which classifying congressional action in the District as local or national will defy mechanical application of the framework set out in this concurrence. *See, e.g., Thomas v. Berry,* 729 F.2d 1469 (D.C.Cir.1984). That

such cases are likely to arise, however, should not be allowed to obscure the central point: national legislation uniquely applicable to the District of Columbia is not insulated from jurisdictionally-based equal protection scrutiny merely because Congress possesses "plenary power" over the District. Whatever one thinks of the idea of states as "little laboratories" in other contexts, the District of Columbia is assuredly not *ipso facto* a proper proving ground for discriminatory application of national law.

This point is overrun in the majority's opinion. There is no doubt that Cohen is properly confined in St. Elizabeth's, for Congress, in its capacity as local sovereign for the District, has enacted valid rules for the confinement of individuals found not guilty by reason of insanity. That Cohen's case is easy, however, does not countenance a decision which endorses national legislation that singles out inhabitants of the District of Columbia for the selective deprivation of important, *federal,* rights. Such legislation *may* be valid, but that conclusion can be reached only after the appropriate equal protection analysis has been carried out. The judicial obligation to carry out this analysis does not, as the majority would have it, evaporate at the sound of the talismanic words "plenary power."

The tangled web of democracy in the District of Columbia is not easy to sort out or unravel. The framers did provide a special niche in the Constitution for this jurisdiction and did give Congress a unique and sovereign power over it. But in so doing they nowhere suggested that the people who inhabit the District of Columbia were to be stripped of any of the protections afforded other United States citizens. Just as Congress can pass no law abridging the freedom of speech of District residents, neither can it ignore in the District the equal protection presumption that *national* legislation should apply nationwide. When Congress acts as the national legislature, equal protection principles require that it treat residents of the District of Columbia

with the same concern and respect that is given to residents of any other jurisdiction. Such a requirement of proportionality is especially pertinent to laws uniquely impacting D.C. residents since they have no voting voice of their own in the national legislature to gainsay disproportionality in the first place. Because the majority opinion appears to ignore this requirement, I join only the result reached today.[*]

MacKINNON, Senior Circuit Judge, concurring:

I concur in Judge Scalia's opinion. The *en banc* opinion, which reverses the panel decision, and the present unanimity of this court regarding the constitutional issue, make it unnecessary to deal with some of the issues that were covered by my original dissent to the panel opinion. But one part of my former dissent buttresses Judge Scalia's opinion and is still relevant to the resolution of the issues involved: the fact that historically, from the earliest times, it has been the States that have exercised the power under the Tenth Amendment to provide for the confinement and care of insane persons. As the Supreme Court has recently stressed, history may be highly relevant to the proper interpretation of constitutional provisions. *Lynch v. Donnelly*, —— U.S. ——, 104 S.Ct. 1355, 1361, 79 L.Ed.2d 604 (1984) (history can help "illuminat[e]" the "ultimate constitutional objective" of a particular provision); *Marsh v. Chambers*, —— U.S. ——, 103 S.Ct. 3330, 3334, 77 L.Ed.2d 1019 (1983) ("historical evidence sheds light . . . on what the draftsmen intended," and long-standing practice is evidence of the meaning of a constitutional provision); *Walz v. Tax Commission*, 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 ("an unbroken practice . . . is not something to be lightly cast aside"). The portion of my original dissent reprinted below demonstrates that

care and commitment of the insane is, and has been, a uniquely *State* function. A *nationwide* commitment law—which the appellant advocates—would give rise to serious constitutional questions regarding the scope of the authority of Congress to act in the general field of insanity. The constitutional doubts that would surround a contrary decision lend further support to the court's disposition of this case.

The following excerpts are from my dissent to the original panel opinion:

"As has been shown, Congress has not attempted to enact a federal automatic commitment act. Furthermore, it is highly questionable whether Congress even possesses the constitutional authority to require the compulsory commitment and permanent care of insane persons acquitted of United States Code offenses outside of the District. . . . [W]hen a person brings suit on equal protection grounds to challenge the constitutionality of a governmental action, it must appear first that the *same sovereign* had jurisdiction over all the classes of persons involved, and, second, that this same sovereign possessed the constitutional authority and duty to provide the same benefits or protections to them. Equal protection *analysis* only has validity if these requirements are satisfied.

. . . . .

"A. *Congress' Power to Provide for Commitment of Insane Persons*

"Because the government can only act 'unequally' with respect to two classes if it has *identical* power to act upon them and refuses to act equally, the contention that equal protection is denied raises the important question of whether Congress has constitutional authority to enact automatic criminal commitment procedures to apply to *all* defendants charged with United States Code offenses who are tried in United States district courts outside the

---

[*] Once it is recognized that national legislation uniquely applicable to the District of Columbia must survive equal protection scrutiny, the level of scrutiny applied becomes of critical importance. I find it unnecessary to broach this question in this case in light of my view that the

legislation at issue here is local rather than national. Were I to reach the issue, however, I could not subscribe to the majority's equal protection analysis. I leave my disagreement with the majority on that count for another day.

District and found *not guilty* solely by reason of insanity....

. . . . .

"B. *The Federal Mental Defectives Act*

"A serious question exists as to whether Congress possesses the constitutional power to enact a nationwide federal commitment procedure for all persons *acquitted* of federal crimes who raised an insanity defense. Congress has already legislated to confer upon the federal courts a *residual, emergency authority* to commit persons, *accused* or *convicted* of committing federal offenses, to the custody of the Attorney General in the event that suitable arrangements with the person's state of residence for his care cannot be made.[19] This expressly limited residual authority granted to the federal courts has never been extended to allow the commitment of persons *acquitted* of federal crimes. Because the power to act in the general field of lunacy is a power reserved to the states under the Tenth Amendment,[20] and that full responsibility has been traditionally exercised by every state, it may be seriously doubted whether the federal police power legitimately could or should be extended to encompass every person *acquitted* on an insanity defense of federal crimes....

"The federal decisions that have considered the power of Congress to legislate in the lunacy area have arisen as challenges to the constitutionality of the Federal Mental Health Defectives Act of September 7, 1949, 63 Stat. 686, now codified at 18 U.S.C. §§ 4244–4248 (1976).

"Section 4244 sets forth the procedure for determining mental incompetency during the period 'after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation.' A similar procedure is provided in section 4245 for persons in prison who are believed to have been mentally incompetent at the time of their federal trial but where the issue *was not raised or determined before or during the trial.*

"Section 4246 provides that whenever the trial court determines, under sections 4244 and 4245, that an *accused* is or was mental-ly incompetent, the court may commit the accused to the custody of the Attorney General until the accused becomes mentally competent to stand trial or until the pending charges against him are disposed of according to law. Further, under section 4246, if the court after a hearing as provided for in sections 4244 and 4245 finds that the conditions specified in section 4247 exist, the commitment will be governed by the provisions of section 4248.

"Section 4247 covers situations when a prisoner's sentence is about to expire and the prison board of examiners finds him insane or mentally incompetent and a probable danger to the safety of the officers, property, or other interests of the United States. If the board further finds that *suitable arrangements for his custody and care are not otherwise available,* the statute requires the court to have the prisoner examined by at least two psychiatrists and to hold a hearing. If the court then determines on the record that the above specified conditions exist, it may in its discretion commit the prisoner to the custody of the Attorney General.

"Section 4248 provides that the commitment will continue until sanity is restored, or until the prisoner's condition so improves that he will not endanger the safety of the officers, property or other interests of the United States, or *until suitable arrangements are made for the care of the prisoner by his state of residence.* The prisoner retains at all times his right to establish his eligibility for release by writ of habeas corpus.

"The constitutionality of these provisions came under attack in *Wells v. Attorney General of the United States,* 201 F.2d 556 (10th Cir.1953), where the defendant, charged with a United States Code offense, was found to be mentally incompetent in advance of trial and was committed to the custody of the Attorney General under 18 U.S.C. § 4246, *supra.* The defendant subsequently filed a habeas corpus petition. It was denied and he appealed. On appeal the defendant claimed that his mental in-

competency was *permanent,* not temporary, that he in effect would be committed for the remainder of his life and that the federal government did not possess the constitutional authority to carry out permanent commitments.

"Because the district court had made no finding as to whether the defendant's mental condition was permanent or temporary, a divided panel vacated the district court's judgment denying the writ and remanded the case with directions to make the appropriate finding. In reaching its decision in *Wells,* the Tenth Circuit ruled:

> *The several states in their character as parens patriae* [21] *have general power and are under the general duty of caring for insane persons.* The prerogative is a segment of police power. In the exercise of such power, insane persons may be restrained and confined both for the welfare of themselves and for the protection of the public. And if the exactions of due process are met, such restraint and confinement do not violate any constitutional right of the individual. [citations omitted]

> *While the care of insane persons is essentially the function of the states in their sovereign capacity as parens patriae, and while the federal government has neither constitutional nor inherent power to enter the general field of lunacy, Congress has the power to make provision for the proper care and treatment of persons who become temporarily insane* while in custody of the United States awaiting trial upon criminal charges, and to make provision for the care and treatment of federal prisoners who become mentally incompetent during their incarceration after conviction. [citations omitted].

"*Wells, supra* at 559 (emphasis added). This ruling was expressly approved by the Ninth Circuit in *Higgins v. United States,* 205 F.2d 650, 652–53 (9th Cir.1953), another case attacking the constitutionality of 18 U.S.C. §§ 4244 and 4246. The recent decision in *United States v. Clark,* 617 F.2d 180, 184 n. 5 (9th Cir.1980), recognizes that the general field of lunacy is reserved to the states, and continues reliance on *Higgins.*

"C. *The Supreme Court's Decision in Greenwood v. United States.*

"Following the decisions in *Wells* and *Higgins* that the federal government may make provision for the care and treatment of those who have become insane *temporarily* while in its custody awaiting trial, or during incarceration *after* conviction, the Eighth Circuit in *Greenwood v. United States,* 219 F.2d 376 (8th Cir.1955) *(en banc), aff'd,* 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956), considered the further question whether Congress possesses the constitutional power to provide for the care and custody of an accused whose mental incompetence is or may be of *permanent or indefinite* duration. *Id.* at 386. The *Greenwood* court also considered the contentions that sections 4246–4248 of Title 18 U.S.C., the Mental Defectives Act, impermissibly encroach upon powers reserved to the states by the Tenth Amendment and violate the due process clause of the Fifth Amendment. *Id.* at 378.

"The Eighth Circuit held that the validity of the statutes did not depend upon the probable duration of the mental incompetency of the federal prisoners; and that the statutes neither violated the due process clause of the Fifth Amendment nor encroached upon the police power of the states reserved to them by the Tenth Amendment.

"In affirming the decision of the Eighth Circuit, the Supreme Court stated that the statutes deal with mental disabilities which seem more than temporary in duration, and that Congress had power to enact them under the Necessary and Proper Clause of the Constitution. *Greenwood v. United States,* 350 U.S. 366, 373–75, 76 S.Ct. 410, 414–15, 100 L.Ed. 412 (1956). However, the Court expressly limited the scope of its holding by stating that it decided no more than the situations before it and did not imply any opinion on situations not then before it. *Id.* at 376, 76 S.Ct. at 415.

"In its discussion in *Greenwood* of the extent of national power under the Necessary and Proper Clause, the Court stressed that the prisoner was in federal custody and reasoned: "The petitioner came legally into the custody of the United States. The power that put him into such custody—the power to prosecute for federal offenses—is not *exhausted*. Its assertion in the form of the pending indictment persists." *Id.* at 375, 76 S.Ct. at 415 (emphasis added). This language of the Court raises the question of the point at which the federal enforcement power is exhausted. The logical deduction from the Court's decision in *Greenwood* is that the power of the federal government to place insane persons in custody and make provision for their care, absent the plenary power that Congress possesses in the District of Columbia, terminates when its power to prosecute for federal offenses is exhausted. If a person is convicted, and he is sentenced to imprisonment, the federal government's power over him obviously continues as an incident of its lawful custody, but if the person is found not guilty by reason of insanity, or is otherwise acquitted on an insanity defense, the government's power to confine him terminates barring some highly unusual circumstances.

"In reaching its decision the Court quoted from a report of the Committee of the Judicial Conference [22] which stated:

If the accused's mental disability appears not to be a transitory condition, but in all likelihood he will, because of his insanity, never be brought to trial, it would seem that *as a general rule the federal government should not assume responsibility for his hospitalization merely because he has been accused (but not convicted) of a federal crime. Normally such a person should be turned over to the state of his domicile to be confined in a state mental hospital if hospitalization is called for.*

But there may be cases where the accused's domicile cannot be satisfactorily established and where no state will assume responsibility for his care. The federal government may then be faced with the practical situation that it has lawful custody of a person whom it is not safe to let at large.

"*Greenwood*, 350 U.S. at 373–74, 76 S.Ct. at 414–15 (emphasis added).

"A fair reading of *Greenwood* compels the conclusion that the United States pursuant to its federal enforcement power may make provisions for the custody and care of persons charged with or convicted of federal offenses in the event suitable arrangements for their care and custody cannot be made with the states of their residence. Implicit in this latter provision is the recognition that the care and custody of the insane is basically a state function and duty and, barring some emergency situation, the federal government should not provide, outside the District of Columbia, for federal commitment, automatic or otherwise, of persons acquitted of federal offenses who have raised a successful insanity defense. The custody and care of such persons is a state obligation in most cases.

"D.  *Historical  Background  of  State Care of Insane.*

"Regardless of whether the power to commit, treat, and care for the mentally ill are powers reserved to the states by the Tenth Amendment, history unequivocally confirms that they are functions that the states traditionally have fulfilled and continue to fulfill. With the notable exception of Virginia, which founded a public asylum for the insane in 1769,[23] during the colonial period and during the first forty years following independence, the insane were commonly relegated to local jailhouses and poorhouses or lived with family and friends.[24] Then in the second quarter of the nineteenth century a dramatic transformation occurred and many states began constructing public hospitals for the mentally ill. The sudden willingness of many states to become involved in the care and treatment of the mentally ill stemmed from remarkable claims of easy curability and high-percentage recoveries.[25] By 1850 almost every legislature in the northeastern and midwestern states supported an asy-

**154**

lum; by 1860, twenty-eight of the thirty-three states had constructed institutions for the insane.[26] Although there has been a progressive development in the degree to which states have assumed responsibility for the care and supervision of the insane within [their] boundaries, the states and their political subdivisions have historically assumed sole responsibility for the insane.[27]

"The *Wells-Higgins-Greenwood* line of cases does not firmly resolve the particular question before this court. At the very least it raises substantial questions about the power of Congress to provide for automatic or other commitment procedures for defendants who were charged with federal offenses outside the District of Columbia and whose sole relationship to the federal government is that they were charged with a federal offense and found not guilty by reason of insanity. This uncertainty in the existence of congressional power undermines one of the fundamental premises upon which [any finding of an equal protection violation would have to rest].

. . ."

[19] 18 U.S.C. §§ 4246, 4247 (1976). The constitutionality of this measure was upheld in *Greenwood v. United States,* 219 F.2d 376 (8th Cir.1955) *(en banc), aff'd,* 350 U.S. 366, 76 S.Ct. 410, 100 L.Ed. 412 (1956).

[20] *United States v. Clark,* 617 F.2d 180, 184 n. 5 (9th Cir.1980); *Higgins v. United States,* 205 F.2d 650, 652–53 (9th Cir.1953); *Wells v. Attorney General of the United States,* 201 F.2d 556, 559 (10th Cir.1953).

[21] The term *parens patriae,* which translates to "father of his country," describes the relationship between states and their citizens. Its origin in the English common law embraced the royal prerogative of the King to act as guardian or trustee to persons with legal disabilities such as infants, lunatics and idiots. Bouvier's Law Dictionary (Rawles 3d. rev. ed.); Black's Law Dictionary (5th ed.). Such "powers, which belong to the sovereign as *parens patriae, remain with the states." Fontain v. Revenel,* 58 U.S. (17 How.) 369, 392–93, 15 L.Ed. 80 (1854) (emphasis added); *see Louisiana v. Texas,* 176 U.S. 1, 19, 20 S.Ct. 251, 257, 44 L.Ed. 347 (1900); *American Loan & Trust Co. v. Grand Rivers Co.,* 159 F. 775 (C.C.W.D. Ky.1908). Recently, the doctrine has been extended to sustain claims by *states* for damages to its quasi-sovereign interests in its citizens as consumers. *West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1089 (2d Cir.), *cert. denied sub*

*nom. Cotler Drugs, Inc. v. Chas. Pfizer & Co.,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). Federal antitrust statutes recognize this status. 15 U.S.C. § 15c(a)(1) (1976).

[22] The legislation that became 18 U.S.C. §§ 4244–4248 was originally proposed by the Judicial Conference of the United States after extensive study by a select committee of federal judges from different circuits.

[23] A. DEUTSCH, THE MENTALLY ILL IN AMERICA 230 (2d ed. rev. 1949) [hereinafter DEUTSCH].

[24] D. ROTHMAN, THE DISCOVERY OF THE ASYLUM 130 (1971) [hereinafter ROTHMAN].

[25] *See generally,* DEUTSCH, chap. VIII, "The Cult of Curability and the Rise of State Institutions."

[26] ROTHMAN at 130.

[27] *See generally,* DEUTSCH, chap. XII, "The Trend Toward State Care."

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur only in the result reached by the court. On the facts of this case, I agree that the challenged procedures enacted by Congress for "commitment" of federal criminal defendants in the District of Columbia do not violate the equal protection component of the due process clause of the Fifth Amendment.