**UNITED STATES of America**

v.

**Farhad TALEBNEJAD, et al.   Defendants**

**No.   CRIM.PJM 03–0517.**

United States District Court, D. Maryland.

Sept. 28, 2004.

Christopher Mead, Esquire, Washington, DC, Joseph Lee Evans, Esquire, Dale P. Kelberman, Esquire, Baltimore, MD, Timothy Joseph Sullivan, Esquire, College Park, MD, for Plaintiffs.

David Salem, Esquire, Greenbelt, MD, for Defendants.

## *OPINION*

MESSITTE, District Judge.

### I.

Farhad, Fatameh and Abdolrahman Talebnejad have been charged with one count of conspiracy to conduct an unlicensed money transmitting business in violation of 18 U.S.C. § 371 (Count I), and two counts of operating an unlicensed money trans-

mitting business in violation of 18 U.S.C. § 1960 (Counts II and III). Defendants have filed a Motion to Dismiss Indictment and Forfeiture Claims and a Motion to Dismiss Indictment for Selective Prosecution or, in the Alternative, for Discovery Related to Selective Prosecution Motion. Having considered the Government's Oppositions and oral argument of counsel, the Court will GRANT WITHOUT PREJUDICE the Motion to Dismiss the Indictment and Forfeiture Claims. The Motion to Dismiss Indictment for Selective Prosecution will be DEEMED MOOT.

## II.

In 1992, Congress adopted the original version of 18 U.S.C. § 1960 which provided:

(a) Whoever conducts, controls, manages, supervises, directs, or owns all or part of a business, *knowing the business is an illegal money transmitting business,* shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section -

(1) The term "illegal money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and -

(A) is *intentionally operated without an appropriate money transmitting license* in a State where such operation is punishable as a misdemeanor or a felony under State law; or

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section .... (Emphasis added)

18 U.S.C. § 1960 (1992) (amended by 2001 Amendments, Pub.L. No. 107–56, § 373(a)).

The purpose of the statute was "to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises." *United States v. Velastegui,* 199 F.3d 590, 593 (2d Cir.1999). *See also* S. Rep. 101–460, reprinted in 1990 U.S.S.C.A.N. 6658–59 ("The New York Times reported on September 25, 1989 ... that State banking regulators around the country have found that thousands of small, inner-city money transmitting and checkcashing businesses are sending billions of dollars to drug dealers in South America and Asia and that the majority of these businesses are illegal, unlicensed and unregulated .... The legislation does not preempt State laws. Instead, it provides for an expanded Federal role in a way that enhances and supplements State regulation.")

In 2001, in the wake of the traumatic events of September 11 of that year, Congress adopted the PATRIOT Act, modifying 18 U.S.C. § 1960, as follows:

(a) *Whoever knowingly conducts,* controls, manages, supervises, directs, or owns all of part of *an unlicensed money transmitting business,* shall be fined in accordance with this title or imprisoned not more than 5 years, or both,

(b) As used in this section -

(1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and -

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, *whether or not the defendant knew that the operation was required to be licensed or*

*that the operation was so punishable;*

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; [1] or

(C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

(2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and

(3) the term "State" means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States. (Emphasis added.)

Legislative history behind the amendment is scant, but the Department of Justice recently summarized its purpose in its *Report From the Field: The USA PATRIOT Act at Work:*

> The USA PATRIOT Act also strengthened the criminal laws against terrorism by making it easier to prosecute those responsible for funneling money to terrorists. Under previous federal law, 18 U.S.C. § 1960, those who operated unlicensed money transmitting businesses were entitled to rely on the affirmative defense that they had no knowledge of the applicable state licensing requirements. Some of these businesses, called hawalas, have funneled extensive amounts of money to terrorist groups abroad. *Section 373 of the USA PATRIOT Act amended federal law by eliminating this loophole requiring that the defendant know about state licensing requirements....* (Emphasis added)

DOJ REPORT 10 (July 2004).

Section (b)(1)(A) of § 1960 refers to acts "punishable as a misdemeanor or a felony" under the law of a given state which, in this case, implicates the law of the State of Maryland as it pertains to money-transmission businesses.

Section 12–405 of the Financial Institutions Article of the Maryland Code provides that:

> A person may not engage in the business of money transmission if that person, or the person with whom that person engages in the business of money transmission, is located in the State unless that person:
>
> (1) Is licensed by the Commissioner;
>
> (2) Is an authorized delegate of a licensee under whose name the business of money transmission occurs; or
>
> (3) Is a person exempted from licensing under this subtitle.

1. Under 31 U.S.C. § 5330, any person who owns or controls a money transmitting business must register the business (whether or not the business is licensed as a money transmitting business in any state) with the Secretary of the Treasury, no later than the end of the 180–day period beginning on the date on which the business is established. The statute, *inter alia,* describes the form and manner of registration (according to regulations prescribed by the Secretary of the Treasury), the contents of registration, and defines "money transmitting business" and "money transmitting service." 31 U.S.C. § 5330(a), (b) & (d). The penalty for failure to comply with any requirement of this section or any regulation promulgated thereunder is $5,000 for each violation. Each day the violation continues constitutes a separate violation. 31 U.S.C. § 5330(e)(1) & (2).

Section 12–401(1) of the Article defines "money transmission" as follows:

(1) "Money transmission" means the business of selling or issuing payment instruments or stored value devices, or receiving money or monetary value, for transmission to a location within or outside the United States by any means, including electronically or through the Internet.

(2) "Money transmission" includes:

(i) A bill payer service;

(ii) An accelerated mortgage payment service; and

(iii) Any informal money transfer system engaged in as a business for, or network of persons who engage as a business in, facilitating the transfer of money outside the conventional financial institutions system to a location within or outside the United States.

Section 12–430 of the Article sets out the penalties for violation of the law:

Any person who *knowingly and willfully* violates any provision of this subtitle is guilty of a felony and on conviction is subject to a fine not exceeding $1,000 for the first violation and not exceeding $5,000 for each subsequent violation or imprisonment not exceeding 5 years or both.[2] (Emphasis added)

### III.

According to the Second Superseding Indictment in this case, beginning no earlier than October 26, 2001 and continuing through in or about December, 2002, Abdolrahman Talebnejad, his wife Fatameh, and their son Farhad, were owners, directors or operators of two money transmitting businesses located in Potomac, Maryland, namely Shirazi Money Exchange, a/k/a/ Shirazi Exchange, Inc., and Shirazi Arz, Inc., a/k/a Shirazi Arz Exchange. Both entities, according to the Indictment, are "in the business of accepting currency and money for transfer into and out of the United States through foreign currency exchanges and financial institutions in countries including the United Arab Emirates." As such, the Government charges that the Talebnejads have violated 18 U.S.C. § 1960, either by conducting money transmitting businesses unlicensed by the State of Maryland under 18 U.S.C. § 1960(b)(1)(A), or because Defendants failed to comply with federal registration requirements for such businesses under § (b)(1)(B). The operation of these businesses also underlies the Government's charge that, from in or about December 2000 through in or about December 2002, Defendants conspired to violate the law regarding the operation of money transmitting businesses (Count I), either because the businesses were unlicensed by the State of Maryland or because Defendants failed to comply with the federal registration requirements for such businesses as set forth in 31 U.S.C. § 5330.[3]

### IV.

Defendants argue that the federal statute prohibiting unlicensed money transmit-

---

**2.** Prior to October 1, 2002, violation of the Maryland statute was a misdemeanor, punishable by up to 5 years in jail and a fine of $1,000.00. *See* 2002 Md. Laws, Ch. 539.

**3.** The Court does not understand the Government to be charging Defendants with separate violations of 31 U.S.C. § 5330, since the Indictment contains no separate counts as to those alleged offenses.

The penalty for operating an illegal money transmitting business under 18 U.S.C. § 1960 is imprisonment for not more than 5 years or a fine in accordance with Title 18 of the Code. "Fines" under Title 18 are established by Sections 3571–3574. These are different and distinct from the (apparently flat) $5,000 fine for each day a violation of the registration requirements continues. *Compare* 31 U.S.C. § 5330.

ting businesses violates Equal Protection guarantees under the Due Process Clause of the Fifth Amendment. Some states, they point out, punish unlicensed businesses of this type, while others do not. Since punishment involves incarceration, a fundamental right is burdened; hence the strict scrutiny standard of review applies. Because there is no compelling reason why citizens of different states should be treated differently in this regard, the statute cannot withstand constitutional scrutiny. Defendants also contend that the statute's lack of any intent element violates Due Process; that the statute is void for vagueness because it fails to provide adequate notice of what it prohibits and who is subject to its proscriptions and contains no standard for proper enforcement; that the Indictment must be dismissed for failure to inform them of the offenses with which they are charged; and that Defendants' prospective forfeiture of $18 million, as suggested by the Indictment, would violate the Excessive Fines Clause of the Eighth Amendment to the Constitution.

The Government disputes that 18 U.S.C. § 1960 is subject to strict scrutiny analysis or that it denies Equal Protection. To the extent that Equal Protection guarantees apply, it says, the statute should be examined under the rational basis test, which it easily satisfies. The Government denies any Due Process violation insofar as the statute may lack a scienter requirement or that it is void for vagueness since the statute adequately informs Defendants of the charges against them and provides appropriate standards for enforcement. Lastly, the Government submits that Defendants' Excessive Fines argument is premature, and is more appropriately addressed at sentencing.

## V.

The Due Process Clause of the Fifth Amendment to the U.S. Constitution incorporates Equal Protection guarantees. *See, e.g., Adarand Constructors v. Pena,* 515 U.S. 200, 215–17, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

Defendants argue that their right to Equal Protection is denied by 18 U.S.C. § 1960 because some states (such as Maryland) punish unlicensed money transmitting businesses whereas other states (such as Alabama, *see* Ala.Code, § 5–5A–1 *et seq.*) do not.

Although the state of modern Equal Protection doctrine is somewhat unsettled, Equal Protection claims are usually evaluated on a multi-tiered basis—laws affecting suspect classes or those affecting a fundamental right or interest are subject to a strict scrutiny review, while laws that do not involve a suspect class or burden a fundamental right or interest are reviewed on the basis of a simple rationality test.[4] *See, e.g., McLaughlin v. Florida,* 379 U.S. 184, 191–92, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (suspect class: minority racial group); *Shapiro v. Thompson,* 394 U.S. 618, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (fundamental right or interest). The Government must demonstrate a "compelling interest" to withstand strict scrutiny, while it need only show a reasonable basis for the law to satisfy the rationality test. *Id.*

Defendants contend that, because 18 U.S.C. § 1960 carries a possible jail term of 5 years and fines and forfeitures in the millions of dollars, it burdens a fundamental right, namely one's interest in bodily liberty, hence strict scrutiny must be applied.

---

4. There is also sometimes said to be an intermediate level of review for "quasi-suspect" classes, such as those based on gender. *See, e.g., Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). The parties do not argue that the intermediate level of review is applicable in this case.

The Government argues that no fundamental right or interest is involved simply because a criminal statute carries the possibility of incarceration, fine or forfeiture.

No Supreme Court case addresses the point directly. *United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1958), cited by the Government, is at best suggestive. Although it dealt with the Assimilative Crimes Act, 18 U.S.C. § 13, pursuant to which the Federal Government adopted for federal enclaves certain criminal laws of the state where the enclaves were located (meaning different laws for different states to the extent that the laws might differ from one another), the precise issue there was whether Congress could incorporate state criminal law as it might be modified in the future.

*United States v. Cohen*, 733 F.2d 128 (D.C.Cir.1984) is more on point. *Cohen* involved a Congressional law that provided for the automatic commitment of defendants acquitted by reason of insanity in federal court in the District of Columbia. Defendant argued that Congress could not legitimately single out persons in the District of Columbia for burdens not imposed upon citizens everywhere else. The U.S. Court of Appeals for the District of Columbia (Scalia, J.) held that no fundamental right (and no suspect class) was implicated, hence the rational basis test applied:

> In the vast majority of equal protection cases, the focus, for purposes of determining whether a "fundamental interest" is involved, is not upon the punishment or other imposition to which the complaining party has been subjected, but rather upon the *activity* of the complaining party which has been made the

*reason* for the punishment or imposition. (Emphasis in original)

\* \* \* \* \* \*

> It seems unlikely that strict scrutiny of the classification of punishments or impositions on the basis of "fundamental interest" analysis has any place in modern equal protection law. (Footnote omitted)

733 F.2d at 133–34.[5]

The court found a rational basis for the unequal treatment of individuals in the District of Columbia in Congress's express desire to defer to the States to care for the mentally ill, in Congress's special concern for the District of Columbia, and in the exclusive constitutional grant of authority to Congress to legislate for the "Seat of Government of the United States," as provided in the U.S. CONST. art. I, § 8, cl. 17.

Other federal courts have responded in similar fashion to claimed denials of Equal Protection where federal criminal law has incorporated the variable laws of the states by reference. This has been true in the few cases that have interpreted 18 U.S.C. § 1960. *See United States v. Barre*, 313 F.Supp.2d 1086 (D.Colo.2004) (unpublished opinion reversing *United States v. Barre*, 313 F.Supp.2d 1086 (D.Colo.2004)); *United States v. Elfgeeh*, No. CR–03–0133 (CPS) (E.D.N.Y., April 12, 2004); *United States v. Gavidel*, No. 01–CR–0417 (TPG), 2002 WL 1203845 (S.D.N.Y. June 3, 2002). It has also been true, for example, with respect to federal laws proscribing gambling activities, *see, e.g., United States v. Smaldone*, 485 F.2d 1333, 1343 (10th Cir.1973); *cert. denied*, 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974); *United States v. Villano*, 529 F.2d 1046, 1056 (10th Cir.1976);

**5.** *But cf. Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (Louisiana statute denied Due Process by permitting continued confinement of individual acquitted of crime by reason of insanity, when individual was not mentally ill.) (Plurality decision: "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

*United States v. Aquino,* 336 F.Supp. 737, 740 (E.D.Mich.1972), and with respect to definitions of predicate crimes for purposes of sentence enhancement under federal sentencing law, *see, e.g., United States v. Collins,* 61 F.3d 1379, 1383 (9th Cir. 1995); *United States v. Phelps,* 17 F.3d 1334, 1343–44 (10th Cir.1994); *United States v. Bregnard,* 951 F.2d 457, 461 (1st Cir.1991); *United States v. Houston,* 547 F.2d 104, 107 (9th Cir.1977). To the extent that these courts have analyzed the Equal Protection argument, they have not applied the strict scrutiny test—finding no burdening of a fundamental right—but the rationality test. And that test, which begins with a strong presumption of constitutionality,[6] has been found easily satisfied.

From the standpoint of rationality, federal incorporation of state law, whether criminal or civil, may serve several policies, not the least of which is simply reinforcement of state policy. *See Cohen,* 733 F.2d at 133 ("It would have been enough, for purposes of 'rational basis' analysis, merely that [the substantial concern of federalism] *could have* underlain the congressional reluctance to legislate more broadly.") (Emphasis in original) Certainly that much can be said of Congress's purpose in enacting the money transmission law originally. As set forth in the Senate Report: "Although most but not all States have some form of licensing requirements, in many instances, insufficient State resources have been devoted to regulation and supervision of the industries or to the pursuit of criminal cases against illegal operators .... [The legislation] provides for an expanded Federal role in a way that enhances and supplements State regulation." S. Rep. 101–460, *supra.*

The Court sees no reason to swim against the tide established by virtually all the courts that have considered the question. The appropriate test for the constitutionality of federal criminal laws that discriminate territorially between citizens of different states is the rational basis test. Applying that test here, the Court concludes that Congress could fairly undertake to fortify state efforts to regulate money transmission businesses. Accordingly, while 18 U.S.C. § 1960 may subject citizens of some states to criminal liability but not citizens of other states, it does not violate Equal Protection guarantees.

## VI.

█ Defendants next argue that 18 U.S.C. § 1960 violates Due Process because it lacks a scienter requirement. The Government counters that the statute in fact contains a scienter requirement since under § (b)(1)(A) the Government must show that the defendant knew he was unlicensed, although it need not show that he knew that the lack of license was illegal.

There is no doubt that Congress attempted to exclude any *mens rea* requirement when it amended § (b)(1)(A). A violation occurs "whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable."

The problem, however, is that the clause preceding that clause still refers to the operation of such a business "where such operation is punishable as a misdemeanor or felony under State law."

Bearing in mind that criminal statutes must be strictly construed, *see, e.g., United*

---

6. "The traditional deference *both* to legislative purpose *and* to legislative selections among means continues, on the whole, to make the rationality requirement largely equivalent to a strong presumption of constitutionality." (Emphasis in original; footnote omitted). Laurence H. Tribe, *American Constitutional Law* 1442–43 (2d ed.1988). *See, e.g., High Tech Gays v. Def. Indus. Security Clearance Office,* 895 F.2d 563, 573 (9th Cir. 1990).

*States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), the plain meaning of these words is that unless the lack of a license is "punishable" under state law, it is not a federal crime at all. *See Velastegui*, 199 F.3d at 593 ("[W]e must look to [state] law to determine whether Defendants were operating an illegal money transmitting business"). Indisputably, if a state has no law punishing an unlicensed money transmission business, there is no violation of the federal law. The Court sees no meaningful distinction between states which impose no punishment at all and those which only punish "knowing" and "wilful" violations of their licensing laws.

Maryland is such a state. Its law expressly provides that a "knowing and wilful" violation of its money transmission licensing requirement is punishable as a felony. Md.Code Ann., Fin. Inst. § 12–430 (2003 repl. Vol.).

What do these words mean?

A 1995 case from the Maryland Court of Special Appeals dispels all doubt. In *Reisch v. State of Maryland*, 107 Md.App. 464, 668 A.2d 970 (1995), the defendant was convicted in the trial court of violating Maryland's home improvement licensing law, in part, because he was unlicensed. The Court of Special Appeals reversed the conviction, rejecting "any claim that the terms 'knowingly and wilfully' [in the statute] are mere surplusage or that the home improvement provisions in issue impose strict criminal liability." 668 A.2d at 975. Several of the court's observations bear noting:

> Strict liability criminal offenses that do not require *mens rea* were generally enacted in response "to the demands of public health and welfare arising from the complexities of society after the Industrial Revolution. Typically misdemeanors involving only fines or other light penalties, these strict liability laws

regulated food, milk, liquor, medicines and drugs, securities, motor vehicles and traffic, the labeling of goods for sale, and the like." *Garnett*, 332 Md. at 578, 632 A.2d 797. *See also Dawkins*, 313 Md. at 644–645, 547 A.2d 1041. But, as the Court of Appeals has acknowledged, "the contemporary view ... disfavors strict liability offenses." *Dawkins*, 313 Md. at 650, 547 A.2d 1041. *See also, Garnett*, 332 Md. at 579, 632 A.2d 797 ("Modern scholars generally reject the concept of strict criminal liability"); *State v. McCallum*, 321 Md. 451, 456, 583 A.2d 250 (1991).

\* \* \* \* \* \*

Although the statute here has characteristics that are regulatory in nature, *see, e.g., Dawkins*, 313 Md. at 644, 547 A.2d 1041; *McCallum*, 321 Md. at 456, 583 A.2d 250; *Harry Berenter, Inc.*, 258 Md. at 294, 265 A.2d 759, it is also punitive. Indeed, a maximum period of incarceration of two years is not a "light" penalty, and this factor militates against characterizing the statute as a strict liability " 'public welfare' offense." *McCallum*, 321 Md. at 457, 583 A.2d 250. When, as here, "the statute is both remedial and penal, the remedial portion may be construed liberally while the penal provisions must be strictly construed in favor of the accused and against the State."

\* \* \* \* \* \*

Surely, appellant knew that he did not possess a home improvement license. But the question is whether appellant's failure to obtain a home improvement license compels a finding of a knowing and wilful failure to obtain a license, in violation of §§ 267 and 268.

\* \* \* \* \* \*

For offenses prohibiting the failure to act, such as failure to obtain a license, the term "wilful" is "commonly inter-

preted" as an *intentional* or *deliberate* failure. *See Hoey v. State,* 311 Md. 473, 492, 536 A.2d 622 (1988); *Brown v. State,* 285 Md. 469, 474–75, 403 A.2d 788 (1979). Similarly, the term wilful has been used to characterize an act done with *"deliberate intention"*. *Cover v. Taliaferro,* 142 Md. 586, 596, 122 A. 2 (1923) (cited with approval in *Shell v. State,* 307 Md. 46, 66, 512 A.2d 358 (1986)). *See also In re Taka C.,* 331 Md. 80, 84, 626 A.2d 366 (1993) (deliberate intent requires more than the intent to do the act which leads to the harm; it requires that the defendant actually intended to cause the harm); *Rosenberg v. State,* 164 Md. 473, 476, 165 A. 306 (1933).[7] (Emphasis in original)

668 A.2d at 976–79.

Because the State could not prove that the defendant deliberately intended not to secure a home improvement license, his conviction was flawed.

By a parity of reasoning, the Court finds that the terms "knowingly and wilfully" are not mere surplusage in Maryland's money transmission statute. Unless each of the elements of that offense are alleged and proved beyond a reasonable doubt, the lack of a license simply is not "punishable" in this state. And if the lack of a license is not punishable in Maryland, it is not punishable under 18 U.S.C. § 1960.

■ As for the second clause of § 1960(b)(1)(A), wherein Congress has attempted to extinguish the *mens rea* requirement, at least two conclusions are possible. Either the clause is hopelessly in conflict with the preceding clause's reference to acts "punishable ... under State law" or it is merely inoperative in states such as Maryland where the "knowing" and "wilful" requirement for punishment has been clearly established. The Court recognizes that the second clause of § (b)(1)(A) may still have application in states that have not yet had occasion to determine whether their licensing statutes have a *mens rea* requirement. Accordingly, the Court accepts this latter hypothesis is the more plausible and finds no need to sever or strike the second clause.

Returning to the central point, however: To the extent that any prosecution under 18 U.S.C. § 1960 may go forward on the basis of a Defendant's lack of a Maryland license, the Government must establish that the lack of license was knowing and wilful, *i.e.* that the defendant knew that his lack of license was illegal and that he acted or failed to act intentionally with respect to that fact.

■ This does not exhaust consideration of the *mens rea* requirement in the federal statute. The Government has alleged an alternate basis to establish that Defendants violated 18 U.S.C. § 1960, *viz.,* that under § (b)(1)(B) they failed to comply with the money transmission registration requirements under 31 U.S.C. § 5530. Section (b)(1)(B), of course, contains no reference to scienter one way or another, but it is immediately apparent that Congress made no effort to amend that clause in 2001 when it amended § (b)(1)(A) to exclude a scienter requirement. On the other hand, liability under 31 U.S.C. § 5530 may be established "whether or not the business is licensed as a money transmitting basis in any State," 31 U.S.C. § 5330(a)(1). Accordingly, the Court's

**7.** *See also Bryan v. United States,* 524 U.S. 184, 191–92, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998):

As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." *Ratzlaf v. United States,* 510 U.S. 135, 137, 114 S.Ct. 655, 657, 126 L.Ed.2d 615 (1994).

threshold inquiry of whether the offense is "punishable" under Maryland law has no application and the Court is obliged to confront the constitutional issue head-on.

The Court finds that 31 U.S.C. § 5330 by implication also incorporates a *mens rea* requirement, *i.e.* it must be shown that a Defendant knew he was required to register his money transmission business with the U.S. Treasury and that he intentionally failed to do so. The Court arrives at this conclusion based not only on Congress's failure to amend 18 U.S.C. § (b)(1)(B) when it amended § (b)(1)(A). The conventional understanding is that *mens rea* is a fundamental component of every criminal act. *See Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 96 L.Ed. 288 (1952). *See also* Model Penal Code (U.L.A.) § 2.02. At a minimum, Due Process surely requires that any effort to enact a strict liability criminal statute be clearly expressed, *see Morissette*, 342 U.S. at 263, 72 S.Ct. 240, Model Penal Code, § 2.05, particularly where the crime in question is not obviously one involving the public welfare, *Morissette*, 342 U.S. at 255–56, 72 S.Ct. 240,[8] or public morality,[9] and where the potential punishment and fine are considerably more than minimal in amount, *Morissette*, 342 U.S. at 256, 72 S.Ct. 240, in this case incarceration for up to five years and fines established not only by Title 18 of the U.S.Code, but also by 31 U.S.C. § 5330, as well as possible forfeitures in the millions of dollars.

In sum, to the extent that the Government may choose to re-indict a Defendant under 18 U.S.C. § 1960 based on the Defendant's failure to comply with the federal registration requirements, it will have to allege and prove that the Defendant acted knowing that he had an obligation to register and that he wilfully failed to do so.[10]

## VII.

Defendants make several arguments that 18 U.S.C. § 1960 is void for vagueness.

Before addressing Defendants' specific arguments, the Court makes one overarching observation. Consistent with the Court's previous analysis, for unlicensed activity to be illegal under federal law, the activity must first be proscribed, which is to say "punishable," under Maryland law. That means that any federal indictment must always allege (and the Government must eventually prove) the elements of a violation under Maryland law. If that law was modified at any time during the indicted period, the Indictment would have to allege (and the Government would eventually have to prove) the elements of the offense for activities occurring before the

---

8. Public welfare offenses include, among others, transportation of dangerous liquids or products, *United States v. International Minerals & Chem. Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971), dumping of hazardous wastes, *United States v. Johnson & Towers, Inc.*, 741 F.2d 662 (3d Cir.1984); and killing of protected animals under the Migratory Bird Act, *United States v. Catlett*, 747 F.2d 1102 (6th Cir.1984).

9. Public morality offenses include, among others, statutory rape, *e.g. Garnett v. State*, 332 Md. 571, 632 A.2d 797 (1993) and bigamy, *e.g. Braun v. State*, 230 Md. 82, 90, 185 A.2d 905, 908–09 (1962).

10. Similarly, with regard to any conspiracy charge the Government might bring with reference to 18 U.S.C. § 1960, the Government will have to prove that two or more Defendants entered into an agreement to operate a money transmission business, knowing that the business was required to be licensed under Maryland law and that they intentionally failed to obtain a license or, in the alternative, knowing that federal registration of the business was required, that they wilfully failed to comply.

change and the elements for activities occurring after.

The Court turns to Defendants' arguments.

## VIII.

Defendants say first that the 18 U.S.C. § 1960 is unconstitutionally vague because the Maryland statute that it incorporates fails to provide clear notice of what behavior is proscribed, having been amended by the Maryland General Assembly effective October 1, 2002, which was during the period alleged in the Indictment. The Government contends that there is essentially no substantive difference between Maryland law before and after the amendment, hence Defendants argue a distinction without a difference.

The following excerpt from 2000 Maryland Laws, Ch. 539, indicates the changes in Maryland's definitions of "money transmission," the unbracketed and bracketed lower case language representing the law prior to October 1, 2002, and the unbracketed lower case and unbracketed upper case language representing the law post-October 1, 2002:

(L)(1) "Money transmission" means [the sale or issuance of] THE BUSINESS OF SELLING OR ISSUING payment instruments OR STORED VALUE DEVICES, OR RECEIVING MONEY OR MONETARY VALUE, FOR TRANSMISSION TO A LOCATION WITHIN OR OUTSIDE THE UNITED STATES BY ANY MEANS, [or engaging in the business of receiving money for transmission or transmitting money within the United States or to locations abroad by any means, including payment instruments, wire, facsimile, or electronic transfer] INCLUDING ELECTRONICALLY OR THROUGH THE INTERNET.

(2) "MONEY TRANSMISSION" INCLUDES:

(I) A BILL PAYER SERVICE;

(II) AN ACCELERATED MORTGAGE PAYMENT SERVICE; AND

(III) ANY INFORMAL MONEY TRANSFER SYSTEM *ENGAGED IN AS A BUSINESS* FOR, OR NETWORK OF PERSONS WHO ENGAGE AS A BUSINESS IN, FACILITATING THE TRANSFER OF MONEY OUTSIDE THE CONVENTIONAL FINANCIAL INSTITUTIONS SYSTEM TO A LOCATION WITHIN OR OUTSIDE THE UNITED STATES.

(M) "Outstanding PAYMENT INSTRUMENT" [means sold in the United States and reported to the licensee as not yet paid or transmitted.] MEANS A PAYMENT INSTRUMENT THAT HAS BEEN SOLD OR ISSUED IN THE UNITED STATES DIRECTLY BY A LICENSEE OR AN AUTHORIZED DELEGATE OF A LICENSEE THAT HAS BEEN REPORTED AS NOT YET PAID BY OR FOR THE LICENSEE.

(N)(1) "Payment instrument" means any ELECTRONIC OR WRITTEN check, draft, money order, traveler's check, or other ELECTRONIC OR WRITTEN instrument or [written] order for the transmission OR PAYMENT of money, sold or issued to one or more persons, whether or not [such] THE instrument is negotiable.

(2) "PAYMENT INSTRUMENT" [The term "payment instrument"] does not include any credit card voucher, letter of credit, or [instrument] TANGIBLE OBJECT redeemable by the issuer in goods or services.

The Court sees no need to sort out the material differences between these statutes if, indeed, there are any. However similar or different the definitions may be,

if the behavior that is prosecuted straddles the amendment, the pre-October 1, 2002 definitions must be satisfied with respect to pre-October 1, 2002 activities and the post-October 1, 2002 definitions satisfied as to the post October 1, 2002 activities.

There is another dimension to the nature of the proscribed conduct which requires comment. Insofar as liability under § 1960 is predicated on a defendant's lack of a state license, to the extent that 18 U.S.C. § 1960 may define the term "money transmitting business" more broadly than the Maryland statute—either before or after October 1, 2002—the federal statute simply becomes inoperative. As the Court has emphasized, any prosecution of an unlicensed money transmission business must first be "punishable" under Maryland law. If activities defined in 18 U.S.C. § 1960 are not "punishable" under state law, they do not violate federal law.

On the other hand, to the extent that violation of the federal statute is predicated on a defendant's failure to register a money transmission business under 31 U.S.C. § 5330, *i.e.*, under 18 U.S.C. § 1960(b)(1)(B), the Court again notes that compliance *vel non* with Maryland's licensing law is irrelevant. That statute, by its terms, applies "whether or not the business is licensed as a money transmitting business in any State." 31 U.S.C. § 5330(a)(1). Accordingly, it is the definition of "money transmitting business" under federal law that controls. This suggests that both the definition of "money transmitting" in 18 U.S.C. § 1960(b)(2) and of "money transmitting service" in 31 U.S.C. § 5330(d)(2) must be alleged and eventually proved in any prosecution under § 1960(b)(1)(B).

One further observation: Although charging criminal activity before and after amendment of the Maryland law may be somewhat problematic, the Court concludes that the matter is not so confusing that prosecution is impossible or unfair. Any confusion or unfairness will be greatly minimized if all pre-amendment activity is confined to one count and all post-amendment activity to another.

IX.

A) Defendants initially argued that the Indictment was defective because it failed to adequately inform them of the charges against them. In particular, they argued that the Indictment charged criminal conduct under 18 U.S.C. § 1960 before October 26, 2001, when the statute had a scienter requirement, as well as conduct after the federal statute was amended, when the scienter requirement was ostensibly eliminated. Defendants claimed they were not informed of the scienter element with which they were charged.

The Government apparently acknowledged this confusion and, after submitting its response to the Defendants' Motion to Dismiss the Indictment, filed a Second Superseding Indictment in which Counts II and III alleged illegal operation of a money transmission business, referring only to conduct commencing after October 26, 2001, the date when the scienter requirement was removed from the statute.

Defendants still except, however, to Count One of the Second Superseding Indictment which continues to charge a conspiracy to violate 18 U.S.C. § 1960 beginning from "December 2000 through on or about December 2002." In other words, the most recent Indictment still appears to straddle the scienter/no scienter periods. In its Opposition to the Motion to Dismiss, the Government argues that in fact it is alleging a conspiracy that began on or after October 26, 2001, and is only seeking to prove overt acts that preceded the conspiracy itself.

Apart from the dubiety of the Government's claim that it can allege a conspiracy

beginning on or about December, 2000 in the Indictment while in fact only having in mind a conspiracy beginning on or about October 26, 2001, its argument is essentially academic. The Court has already held that whatever span of the conspiracy may be alleged in connection with this case will require proof of scienter. But the Court will nonetheless direct that, to the extent Defendants may be re-indicted on a conspiracy charge, the Indictment must set forth the approximate beginning date of the conspiracy (not the date of an allegedly earlier overt act) as well as the approximate ending date.

■ B) Defendants also say that § 1960 fails to provide clear notice of who is required to obtain a license.

By its terms, they argue, 18 U.S.C. § 1960 punishes anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960. In contrast, § 12–405 of the Financial Institutions Article of the Maryland Code, the licensing requirement incorporated into § 1960, does not indicate who is required to obtain the state license. Instead, § 12–405 merely provides that a person may engage in the business of money transmission if the person: 1) has a license, 2) is the designee of a licensee, or 3) is exempt from obtaining a license. Md. Code Ann., Fin. Inst. § 12–405. Section 12–405 does not specifically require that any of the persons enumerated in § 1960 obtain a license. As a consequence, any number of individuals affiliated with an unlicensed money transmitting business could be punished under § 1960 despite the fact they may not be required to obtain

a license under § 12–405 or otherwise make certain that a license has been obtained.

The Government says Defendants "show a complete lack of understanding of the Maryland and federal money remitting statutes." The state statute focuses on the money remitting business, requiring that the business, whether in the form of an individual or an entity, be licensed or exempt from licensing. Thus, the law requires that the business be licensed and does not require designation of a particular person to obtain the license. The federal statute, on the other hand, focuses on the individual: *whoever* knowingly manages, supervises or otherwise controls a money remitting business, is punishable for operating an unlicensed money remitting business. The federal law focuses on any individual who intentionally operates an unlicensed money remitting business; that person is subject to § 1960 penalties. If an individual manages an unlicensed money remitting business—even if he or she does so sparingly—that person is subject to § 1960.[11]

Once again, insofar as the Government bases its prosecution on 18 U.S.C. § 1960(b)(1)(A), the Court finds that the lack of license must be punishable under Maryland law before it may be punished federally. Accordingly, only those persons who are punishable under Maryland law can commit or be charged with a federal crime. To the extent that the federal statute seeks to punish a more expansive category of individuals, the Court deems it inoperative.

---

11. In a supplementary letter to the Court, the Government appears to have taken a somewhat different position, citing various Maryland statutes that define "person" as referring not only to businesses but to individuals, trusts, associations, and the like. As Defendants point out, however, the Government still has not answered the question of who, when an organizational entity is involved, is required to obtain the license and who may be criminally liable for knowingly and wilfully failing to do so.

Who, then, does Maryland punish for unlicensed activity?

The Government concedes that Maryland law "requires that the *business* be licensed and does not require designation of a particular person to obtain the license." (Emphasis added). Indeed, as related anecdotally by defense counsel at oral argument, it appears that in 1995 the Maryland State Bank Commissioner sent a notice relative to licensing to the resident agent of one of the corporations alleged to have violated 18 U.S.C. § 1960 in this case. It is clear that, in addition to a corporation, an individual doing business as a sole proprietor would also be prosecutable under Maryland law. The question is whether an individual officer, director, shareholder or mere employee of a corporation could be individually charged.

The short answer is that, under certain circumstances, a corporate officer through whose act or failure to act a corporation commits an offense against state law may well be found guilty of the same offense. *Fletcher Cyclopedia of the Law of Private Corporations* states the general principles:

> The existence of the corporate entity does not shield from prosecution the corporate agent who knowingly and intentionally causes the corporation to commit a crime. The corporation obviously acts, and can act, only by and through its human agents, and it is their conduct which the criminal law must deter, and those actors who in fact are culpable. Since a corporation is an individual existing only in contemplation of the law, its criminal acts are those of its officers and agents; and thus persons in control of a corporation and who knowingly acquiesce to the corporation's illegal conduct may be personally prosecuted for the criminal act.

> \*      \*      \*      \*      \*      \*

Where the violation alleged is of a passive nature, such as failure to comply with a statute or regulation, generally the prosecution must prove that the officer had the responsibility and authority to ensure compliance.

A number of federal cases are illustrative. *See, e.g., United States v. Park*, 421 U.S. 658, 673, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975) (in prosecution for interstate shipment of adulterated food, president of corporation could not be held responsible solely on basis of position in corporation; to be guilty jury had to find "by virtue of his position ... [he] had ... authority and responsibility to deal with the situation"); *United States v. Jorgensen*, 144 F.3d 550, 560 (8th Cir.1998) (corporate officer who had intent to defraud and either personally participated in misbranding of meat or was in "responsible relationship" to misbranding by company could be held criminally responsible); *United States v. Amrep Corporation*, 560 F.2d 539, 545 (2d Cir.1977) (in mail fraud/interstate land sales fraud prosecution, corporate officers who were active and knowing participants in illicit scheme would be equally liable under corporation); *United States v. Schlei*, 122 F.3d 944, 971 (11th Cir.1997) (in conspiracy/securities fraud prosecution, corporate officers who wilfully participated in the scheme could be held criminally responsible); *United States v. Kyle*, 257 F.2d 559, 563 (2d Cir.1958) (in prosecution for mail fraud secretary-treasurer of corporation could be individually liable for criminal activity of corporation, "whether he be called a mailing consultant or an officer and director who was a knowing and active participant in the operations" of the swindle); *but cf. Feder v. The Videotrip Corporation*, 697 F.Supp. 1165, 1177 (D.Colo. 1988) (claim for copyright infringement may be brought against officer or stockholder who is responsible for corporation's infringing activities).

As a corollary of these cases, it must be said that to the extent that an officer, director, shareholder, or employee had no responsibility with regard to the corporate act whose commission or omission comprises the criminal act and to the extent that that person did not knowingly act or omit to act, there can be no criminal liability on the part of that individual. Which brings us back to the present case. The Court finds that under Maryland law the only individuals who would conceivably be "punishable" under Maryland law for a corporation's failure to obtain a money transmission business license would be the individual or individuals, presumably but not necessarily officers, who had responsibility to apply for a license and who knowingly and wilfully failed to do so.

If the Government chooses to re-charge a Defendant individually in the present case under 18 U.S.C. § 1960(b)(1)(A), it must allege and prove as to such Defendant that he had such responsibility and/or authority to secure a money transmission license business and that he knowingly and wilfully failed to do so.

On the other hand, the Court again distinguishes prosecutions brought under 18 U.S.C. § 1960(b)(1)(B), the registration provision, and § (b)(1)(A), the licensing provision. Because prosecutions under § (b)(1)(B) do not depend upon whether the business is licensed under Maryland law, 31 U.S.C. § 5330(a)(1), the category of who is punishable under the law is as expansive as the federal statute posits, *i.e.*, "(w)hoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a).

The Court finds no constitutional vagueness in this clause. The only caveat is that anyone charged under this provision would have to be shown to have acted knowingly and wilfully.

## X.

The Court agrees with the Government that Defendants' Excessive Fines argument is premature. Until such time as the Court is confronted with concrete facts (as opposed to allegations), any determination as to the proportionality of the forfeiture relative to the gravity of the case, the nature of the offense, the statutory penalties for the offense, and the extent of harm caused by the defendant's offense—all factors bearing on the excessiveness issue, *see United States v. Bajakajian*, 524 U.S. 321, 337–39, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)—would be speculative.

## XI.

The Court concludes that the Second Superseding Indictment in its present form is fatally infirm and must be dismissed. Should the Government decide to re-indict Defendants in accordance with this decision, the case would seem to be in proper order to go forward.[12]

A separate Order will be ENTERED implementing this decision.

## *ORDER*

The Court has considered pending Motions filed by Defendants. Accordingly, it is for the reasons set forth in the accompa-

---

**12.** The Court understands that the Government has seized approximately $1.0 million of Defendants' property which it contends is forfeitable under 18 U.S.C. § 1960. Defendants seek the immediate return of the property. The Court will direct the Government to file a statement with the Court within 30 days in justification of the further detention of these assets. Defendants may file a response in the ordinary course. The Court will hold further hearings on the matter as may be appropriate.

nying Opinion this 24 day of September, 2004

ORDERED:

(1) Defendants' Motion to Dismiss Indictment and Forfeiture Claims (Paper No. 43) is GRANTED WITHOUT PREJUDICE;

(2) Defendants' Motion to Dismiss Indictment for Selective Prosecution, or, in the Alternative, for Discovery Related to Selective Prosecution Motion (Paper No. 42) is DEEMED MOOT;

(3) The Government, within 30 days hereof, SHALL FILE a written statement with the Court in justification of the further detention of any Defendants' assets heretofore seized as potentially forfeitable in connection with this prosecution. Defendants may file responsive pleadings in the ordinary course. The Court will hold further hearings thereon as may be appropriate.